UNITED STATES of America,
Appellant,

and

Flemington Residents Association,
Residents of the Flemington
Area, Plaintiffs,

v.

WASTE INDUSTRIES, INC.; Waste Industries of New Hanover County, Inc.; New Hanover County; The New Hanover County Board of Commissioners; Ellen Williams, Vivian Wright, Claud O'Shields, Howard Armistead, Karen Gottovi, members of the present New Hanover County Board of Commissioners; A.D. Royal; Catherine G. Royal; Carmen M. Butler as Executor of The Estate of Lore R. Butler; Charles A. Royal, Jr.; Faye B. Royal; Eloise R. Peixotto; Elliott R. Peixotto; Mildred R. Simpson; Stephen D. Royal; Patricia V. Royal; Mildred Fleming; and Carmen M. Butler, Appellees,

v.

NORTH CAROLINA DEPARTMENT OF HUMAN RESOURCES and its Secretary, Sarah T. Morrow; North Carolina Department of Natural Resources and Community Development and its Secretary, Howard N. Lee; City of Wilmington; A-1 Sanitation Services, Inc.; Trash Removal Services, Inc.; Bill Hufham, Trading and Doing Business as Rural Enterprises; Jerry Saunders, Trading and Doing Business as A & M Sanitation; Daniel A. Malpass and wife, Janie C. Malpass; Rita Faye Joyner and James V. Joyner, Jr., By Their Duly Appointed Guardian Ad Litem, Annie M. Parker; Kathy Joyner Shoaf; Helen L. Henderson; Willie Jones and wife, Kathleen Jones; Annie M. Parker; Thomas W. Malpass; Jack Malpass and wife, Nancy N. Malpass; Daniel J. Malpass and wife, Ada C. Malpass; B.F. Eichorn, Jr. and wife, Juanita Eichorn; William Fales; Joseph Dale Watts and wife, Barbara W. Watts; Harvey D. Hales and wife, Karen L. Hales, Third-Party Defendants,

Chemical Manufacturers Association,
Amicus Curiae.

No. 83-1320.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 6, 1983.

Decided May 8, 1984.

Wendy B. Jacobs, Dept. of Justice, Washington, D.C. (Courtney Price, Acting Gen. Counsel, Environmental Protection Agency; Carol E. Dinkins, Asst. Atty. Gen., Washington, D.C., Samuel T. Currin, U.S. Atty., Gary Clemmons, Asst. U.S. Atty., Raleigh, N.C., Martin W. Matzen, Dept. of Justice, Washington, D.C., on brief), for appellant.

A. Dumay Gorham, Jr., Wilmington, Del. (Marshall, Williams, Gorham & Brawley, Fred B. Davenport, Jr., Murchison, Taylor & Shell, William L. Hill, II, Hogue, Hill, Jones, Nash & Lynch, Wilmington, N.C., on brief), for appellees.

Robert W. Frantz, Chemical Manufacturers Ass'n, Washington, D.C. (David F. Zoll, Vice President and Gen. Counsel, Richard G. Stoll, Deputy Gen. Counsel, Washington, D.C., on brief), for amicus curiae.

Before WIDENER and SPROUSE, Circuit Judges, and BUTZNER, Senior Circuit Judge.

SPROUSE, Circuit Judge:

After the Environmental Protection Agency (EPA) investigated the Flemington landfill waste disposal site in New Hanover County, North Carolina (the Flemington landfill) for possible water pollution in the surrounding area, the United States of America for the Administrator of the EPA initiated this action against Waste Industries, Inc.; Waste Industries of New Hanover County, Inc.; the New Hanover County Board of Commissioners; and the individual owner-lessors[1] of land used for the Flemington landfill (all defendants will be referred to collectively as the landfill group). The EPA demanded affirmative action by the landfill group under section 7003 of the Resource Conservation and Recovery Act of 1976 (Act), 42 U.S.C. § 6973, to abate alleged threats to public health and the environment posed by hazardous chemicals leaking from the Flemington landfill, to monitor the area for further contamination, to reimburse the EPA for money spent on the area, and to provide residents with a permanent potable water supply.[2] The district court granted the landfill group's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action and the EPA brought this appeal. We reverse.

I

The district court, before ruling on the motion to dismiss, referred the case to a United States magistrate for factual development by order filed April 10, 1980. The magistrate issued lengthy factual findings which were taken as true by the district court for purposes of the motion. Essentially, the findings of fact showed that before 1968, New Hanover County, North Carolina (County) had no trash or solid waste disposal programs or facilities. Private trash and garbage dumps existed throughout the County, but most were simply the result of the public's disposal of garbage and waste on private property without the permission of the property owners. The County first began to address the problem in 1968 when it contracted with the city of Wilmington to use its landfill facilities. The County negotiated leases for two other landfill sites after finding that use of the Wilmington facility did not alleviate the problem. The County's experience with landfill operations was unsatisfactory, however, and in the fall of 1971, the County began looking for other solutions to its disposal problems. After some investigation, the County Board granted Waste Industries, Inc. and Waste Industries of New Hanover County, Inc. (referred to collectively as Waste Industries) an exclusive license to dispose of solid waste generated in the County.

Under the terms of the license, Waste Industries was to establish and operate landfills for the sanitary disposal of solid waste generated within the County on sites Waste Industries owned. Waste Industries was to obtain all licenses and permits for operation of the landfills. The license agreement contained several provisions common to County contracts at that time: it required (a) that Waste Industries hold the County harmless for claims arising out of Waste Industries' actions; (b) that Waste Industries provide a performance bond; and (c) that Waste Industries observe state and local regulations. It also, among other things, required Waste Industries to provide the County with a review of the volume of the material disposed. In return, Waste Industries gained an exclu-

---

**1.** These individuals are A.D. Royal, Catherine G. Royal, Carmen M. Butler as executor of the estate of Lore R. Butler, Charles A. Royal, Jr., Faye B. Royal, Eloise R. Peixotto, Elliott R. Peixotto, Mildred R. Simpson, Stephen D. Royal, Patricia V. Royal, Mildred Fleming, and Carmen M. Butler.

**2.** The North Carolina Department of Human Resources, the North Carolina Department of Natural Resources and Community Development, several trash haulers, residents of the Flemington area, and the Flemington Residents Association were brought into this action as third-party defendants.

sive franchise to operate sanitary landfills within the County to provide sanitary disposal of solid waste, such as inflammable or toxic materials and industrial, commercial, and agricultural by-products. The Waste Industries-County agreement was renewed, rewritten, or amended in 1975, 1977, and 1978.

After signing the initial agreement in 1972, Waste Industries obtained several landfill sites, including the seventy-acre Flemington site leased from private owners. The Flemington leases granted Waste Industries sole use and control of the premises. The landfill Waste Industries then established on the site is situated in a hole from which sand has been removed, known as a "sand barrow pit"; the surrounding soil is composed of highly permeable sand. The Flemington landfill is within a mile of both the Cape New Fear and Northeast Cape New Fear Rivers. During the operation of the landfill, unknown quantities of solid and hazardous waste were buried at the site. These wastes began leaching through the sandy soil beneath them and into the groundwater aquifer below.

Before Waste Industries began operating the landfill, the residents of the Flemington community had high quality groundwater. Flemington area residents first noticed a decline in water quality in autumn 1977, when their water became foul in color, taste, and smell. Some residents suffered illnesses or side effects such as blisters, boils, and stomach distress they attribute to their use of well water. Residents complained to the County Board and demanded help.

In response to residents' demands, the County in 1978 placed surplus water tanks that it still operates in the Flemington area. Many residents, however, had found it difficult to use these tanks because of infirmity or disability. Many families wash their clothes at laundromats and drive to the homes of friends or relatives elsewhere to bathe. Others have abandoned their homes because of the contaminated water.

In addition to constructing the water tanks, the County in August 1978 referred the question of groundwater quality in and near the Flemington community to the North Carolina Department of Natural Resources and Community Development. The Department directed Waste Industries to cease disposing of waste at the Flemington landfill, which it did on June 30, 1979.

Meanwhile, the water contamination problem was brought to the attention of the EPA's regional office, which conducted hydrologic investigations of Flemington groundwater and well water in April, July, and September 1979. The September investigation was the broadest undertaken by the EPA and was designed to determine what landfill wastes were contaminating area groundwater and in what direction the contaminated aquifer groundwater was moving beneath the Flemington area. Analysis of Flemington area groundwater samples taken by the EPA revealed a large number of toxic, organic, and inorganic contaminants, including known carcinogens, resulting from improper disposal of waste at the Flemington landfill. The contaminants found beneath the landfill and in residential wells include tetrachloroethylene, benzene, trichloroethylene; 1, 2-dichloroethane; vinyl chloride, methylene chloride, and lead. These chemicals, migrating from the Flemington landfill, have been detected in residential wells at levels sufficient to affect adversely human health and the environment. The presence of chlorides, dichlorophenol, chlorobenzene, iron, manganese, phenol, and zinc has rendered the water in the wells unfit for human consumption because some of these chemicals are suspected carcinogens and all of them are a source of extremely bad taste or odor in water. Concentrations of lead, benzene, tetrachloroethylene, trichlorethylene, 1, 2-dichloroethane, and vinyl chloride found in three residential wells pose an unacceptably high risk of neurological damage in children and cancer in humans of any age.

After conducting its July 1979 tests, the EPA warned many local residents that continued use of their wells for any purpose would endanger their health, and informed

the County that additional water tanks were needed to meet local residents' needs. The EPA helped the County obtain commitments for three-quarters of the funds needed to install a permanent water system in the Flemington community—half from the federal government and one-quarter from the state of North Carolina. The County initially approved the plan but later abandoned it. Finally, after the September 1979 testing established the landfill as a source of groundwater contamination, the EPA demanded that the County provide an adequate water supply to Flemington residents. A water system funded with federal, state, and local money is now in operation.

The new water system, however, has not solved the problem of escaping waste. As precipitation infiltrates the landfill waste and transports contaminants through permeable soil, the contaminants reach the local aquifer and move laterally through the acquifer in the direction of groundwater flow to the south and east. Tests indicate that the process of leaching and migration of contaminants will continue indefinitely unless remedial action is taken.

## II

The EPA, in its initial complaint, requested preliminary and permanent injunctive relief requiring the appropriate parties: (1) to supply affected residents with a permanent and potable source of water; (2) to develop and implement a plan to prevent further contamination; (3) to restore the groundwater; (4) to monitor the area for further contamination; and (5) to reimburse the EPA for money spent in connection with the Flemington landfill. The EPA later withdrew its request for preliminary relief when the federal, state, and local governments, as described above, jointly funded the installation of a permanent safe water supply, but it continued to demand in its complaint a plan to prevent further contamination, the restoration of groundwater, site monitoring, and reimbursement.

The district court, in a thorough opinion, *United States v. Waste Industries*, 556 F.Supp. 1301 (E.D.N.C.1982), found that the EPA's claim for permanent injunctive relief failed to state a cause of action. It concluded that Waste Industries' failure to abate the leaching of contaminants was not actionable under section 7003 of the Act, because the provision was not intended to apply to past conduct that terminated before enforcement was sought. The district court arrived at this conclusion after considering the language of section 7003, its context, the section's use of the present tense, the location of the section within the complete statute, the section's possible emergency nature, its asserted solely jurisdictional nature, its legislative history, and the presumption against retroactive application of statutes.

On appeal, the EPA contends that the district court relied on erroneous premises to support its conclusion and argues that the broad remedial purposes of section 7003 can only be served by permitting actions such as this requiring malfeasant polluters to correct their past abuses of the environment. The landfill group, relying on the district court's reasoning, reads the statute restrictively. We disagree with this limited interpretation of section 7003 as restraining only active human conduct, and reverse. The stated rules of statutory construction simply do not apply and comparison to other statutes cited by the district court sheds no light on congressional purpose in enacting section 7003.

## III

Section 7003 of the Act provides that [n]otwithstanding any other provision of this chapter, upon receipt of evidence that the handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to health or the environment, the Administrator may bring suit on behalf of the United States in the appropriate District Court to immediately restrain any person contributing to such han-

dling, storage, treatment, transportation or disposal to stop such handling, storage, treatment, transportation, or disposal or to take such other action as may be necessary.

■ The landfill group contends, and the district court held, that this section does not authorize an action to correct hazardous conditions because it only regulates the wastes themselves before or as they are produced, not the conditions they later create. The fallacy of that contention is demonstrated by the indication of Congress that section 7003 remedies exist apart from the other provisions in the Act's structure. In addition, section 7003 stands apart from the other sections of the Act defining the EPA's regulatory authority. The regulatory scheme for hazardous wastes appears in subtitle C of the Act; the scheme for solid wastes, in subtitle D. In contrast, section 7003 appears in subtitle G, and it is designed to deal with situations in which the regulatory schemes break down or have been circumvented.

We do not attach the same significance to the location of section 7003 in the miscellaneous subtitle of the statute as did the lower court. This section is logically placed in the statutory structure to provide a remedy for environmental endangerment by hazardous or solid waste, whether or not those engaging in the endangering acts are subject to any other provision of the Act. Its application "notwithstanding any other provision of this chapter" indicates a congressional intent to include a broadly applicable section dealing with the concerns addressed by the statute as a whole.

The operative language of section 7003 authorizes the administrator to bring an action against any person contributing to the alleged disposal to stop such disposal "*or* to take such other action as may be necessary." 42 U.S.C. § 6973(a) (emphasis added). "Disposal" is defined in 42 U.S.C. § 6903(3) as follows:

The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

The district court held, after a contextual analysis, that this language means only disposal by "active human conduct." We cannot agree. The term "disposal," it is true, is used throughout subtitle C in the sense that the Administrator can regulate current disposal of hazardous waste. In this way, the Act regulates current conduct of would-be polluters. But a strained reading of that term limiting its section 7003 meaning to active conduct would so frustrate the remedial purpose of the Act as to make it meaningless. Section 7003, unlike the provisions of the Act's subtitle C, does not regulate conduct but regulates and mitigates endangerments. The Administrator's intervention authorized by section 7003 is triggered by evidence that the "disposal of ... hazardous waste *may present* an imminent and substantial endangerment." (emphasis added).

The inclusion of "leaking" as one of the diverse definitional components of "disposal" demonstrates that Congress intended "disposal" to have a range of meanings, including conduct, a physical state, and an occurrence. Discharging, dumping, and injection (conduct), hazardous waste reposing (a physical state) and movement of the waste after it has been placed in a state of repose (an occurrence) are all encompassed in the broad definition of disposal. "Leaking" ordinarily occurs when landfills are not constructed soundly or when drums and tank trucks filled with waste materials corrode, rust, or rot. Thus "leaking" is an occurrence included in the meaning of "disposal."

The district court's statutory analysis relied heavily upon the present-tense definition of "disposal" as indicative of an intent to restrain only ongoing human conduct. The Act, however, permits a court to order a responsible party to "stop" activities "*or* to take such other action as may be necessary" (emphasis added) to abate the endan-

germent. Such grammatical niceties as tense may be useful in arriving at a narrowly-sculpted meaning, but they are of little help in interpreting remedial statutes in which actions such as "may be necessary" are contemplated in order to abate gross dangers to a community. Since the term "disposal" is used throughout the Act, its definition in section 6903(3) must necessarily be broad and general to encompass both routine regulatory and the less common emergency situations. Thus it includes such diverse characteristics as "deposit, injection, dumping, spilling, leaking, or placing" wastes. We must assume that Congress included "leaking" as a definitional component of "disposal" for a purpose. We conclude that Congress made "leaking" a part of the definition of "disposal" to meet the need to respond to the possibility of endangerment, among other reasons.

Congress expressly intended that this and other language of the Act close loopholes in environmental protection. *Accord United States v. Price*, 523 F.Supp. 1055, 1071 (D.N.J.1981), *aff'd*, 688 F.2d 204 (3d Cir.1982); *United States v. Solvents Recovery Service*, 496 F.Supp. 1127, 1136 (D.Conn.1980). Limiting the government's enforcement prerogatives to cases involving active human conduct would open a gaping hole in the overall protection of the environment envisioned by Congress, a protection designed to be responsive to unpredictible occurrences. Without a means to respond to disasters precipitated by earlier poor planning, our nation's resources could be "conserved" from further harm, as the title of the Resource Conservation and Recovery Act suggests, but never "recovered" to their former wholesome condition.

## IV

■ The landfill group argues that section 7003 was designed to control pollution only in emergency situations. The district court agreed, concluding that it was similar to other statutes designed by Congress solely to eliminate emergency problems. We find this position unsupportable, for the section's language stands in contrast to "emergency" type statutes. The language of section 7003 demonstrates that Congress contemplated circumstances in which the disposal of hazardous waste *"may present an imminent and substantial endangerment"* (emphasis added); therefore, the section's application is not specifically limited to an "emergency."

The Third Circuit, in its recent interpretation of the Act's section 7003, reached the same conclusion. It described section 7003 as having "enhanced the courts' traditional equitable powers by authorizing the issuance of injunctions when there is but a risk of harm, a more lenient standard than the traditional requirement of threatened irreparable harm." *United States v. Price*, 688 F.2d 204, 211 (3d Cir.1982).[3] Thus the Third Circuit's interpretation of section 7003, far from limiting its application to emergency situations, gave full effect to this expansion of the courts' traditional powers.

## V

Although strictly speaking there is little legislative history to assist us in our quest for exact congressional intent, the history of the Act's amendments is enlightening. The legislative history of the Act as originally enacted contains no specific discussion of the reach of section 7003 and no mention of the reasons for its insertion. The hastiness of the Act's passage in the final days of a congressional session has been well-documented. *See* Kovacs & Klucsik, *The New Federal Role in Solid Waste Management: The Resource Conservation and Recovery Act of 1976*, 3

---

**3.** The court likewise interpreted a similarly-worded provision of the Safe Drinking Water Act (SDWA) 42 U.S.C. § 300i. Its conclusion has support in the legislative history of the analogous provision of the SDWA. The pertinent House committee report states that this language, as used in that act, means that for the United States to take action the risk of harm must be imminent but the harm itself need not be. H.R.Rep. No. 93–1185, 93d Cong., 2d Sess. at 35–36 (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 6454, 6488.

Colum.J.Envtl.L. 205, 216–20 (1976). That the Act was intended to eliminate any remaining loopholes in statutory protection from toxic pollution, however, is plain from a consideration of the legislative history of the statute as a whole. H.R.Rep. No. 94–1491, 94th Cong., 2d Sess. at 4 (1976), U.S. Code Cong. & Admin.News 1976, p. 6238.

 The focus of our attention, then, is not on the Act's legislative history, but on the legislative history of its 1980 amendments, in which various congressional committees addressed the issues of EPA authority under section 7003 and the purposes of this section. Later congressional ratification of the availability of section 7003 as a tool for abating hazards created by inactive solid and hazardous waste disposal sites such as the Flemington landfill has been consistent and authoritative. Although this is not legislative history as such, the views of subsequent Congresses on the same or similar statutes are entitled to some weight in the construction of previous legislation. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). Although the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, *Teamsters v. United States*, 431 U.S. 324, 354 n. 39, 97 S.Ct. 1843, 1864 n. 39, 52 L.Ed.2d 396 (1977), this is not a problem in this case because there was no absolutely "unmistakable intent" of Congress concerning section 7003. To the extent that the precise intent of the enacting Congress may be obscure, the views of subsequent Congresses should be given greater deference than they would be otherwise entitled to receive. *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596, 100 S.Ct. 800, 813, 63 L.Ed.2d 36 (1980).

Later reports issued by the House and Senate committees which developed the Act as originally passed have consistently confirmed the availability of section 7003 as a tool for abating hazards like the Flemington landfill. For example, a congressional report on hazardous waste disposal issued when the 1980 amendments were being drafted observed:

Imminence in this section [7003] applies to the nature of the threat rather than identification of the time when the endangerment initially arose. The section, therefore, may be used for events which took place at some time in the past but which continue to present a threat to the public health or the environment.

Subcommittee on Oversight and Investigations of the Committee on Interstate and Foreign Commerce, Report on Hazardous Waste Disposal, H.R.Comm. Print No. 96–IFC 31, 96th Cong., 1st Sess. 32 (1979) (Eckhardt Report). After noting that "RCRA is basically a prospective act designed to prevent improper disposal of hazardous wastes in the future," the Eckhardt Report points out: "The only tool that [the Act] has to remedy the effects of past disposal practices which are not sound is its imminent hazard authority [section 7003]." *Id.* at 31. Accordingly, the authority to abate waste hazards is expansive:

Section 7003 is designed to provide the Administrator with overriding authority to respond to situations involving a substantial endangerment to health or the environment, regardless of other remedies available through the provisions of the Act.

*Id.* at 32. *Accord United States v. Solvents Recovery Service*, 496 F.Supp. at 1137–38.

It is true that some confusion has been created in the interpretation of section 7003 by the EPA's own earlier interpretation—since abandoned—of its authority under this section. The EPA at first took the position that because of its present tense language the statute was not intended to apply to inactive disposal facilities. 43 Fed.Reg. 58,984 (December 18, 1978). This narrow reading by the agency led the House Committee on Interstate and Foreign Commerce, one of the committees which had developed the original Act, to rebuke the EPA for its lack of vigor in using section 7003 and admonish the agen-

cy that section 7003 "should be used for abandoned sites as well as active ones." H.R.Rep. No. 96–191, 96th Cong., 1st Sess. 5 (1979). Not only did Congress reject the EPA's narrow view of its own authority, but the EPA later reversed its own early interpretation of section 7003. *See* 45 Fed. Reg. 33,170 (May 19, 1980). The agency's current view is, of course, entitled to substantial deference. *See Andrus v. Sierra Club*, 442 U.S. 347, 356–61, 99 S.Ct. 2335, 2340–42, 60 L.Ed.2d 943 (1979) (Supreme Court defers to Council on Environmental Quality's later reversal of earlier interpretation of regulations).

## VI

■ The landfill group next contends, and the district court held, that section 7003 is solely jurisdictional, authorizing remedies or proceedings, not creating liabilities. Those liabilities, in this view, come only from the earlier, regulatory, portions of the Act. The district court took this view of the section for various reasons, some of which we have already discussed and discarded, including the location of section 7003 within the Act and its broad wording. Again, we cannot agree.

Congress intended section 7003 to function both as a jurisdictional basis and a source of substantive liability. The Eckhardt Report states:

§ 7003 is essentially a codification of the common law public nuisance. . . .

However, § 7003 should not be construed solely with respect to the common law. Some terms and concepts, such as persons "contributing to" disposal resulting in a substantial endangerment, are meant to be more liberal than their common law counterparts.

Eckhardt Report at 31. Congress's intent, then, was to establish a standard of liability by incorporating and expanding upon the common law.

The landfill group observes that some courts have held, by analogy to *City of Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), that the regulatory provisions of the Act and

CERCLA are the sole source of substantive standards in the field of solid and hazardous waste disposal. If true, this would leave no room for the application of common-law principles. This, however, misreads the lesson of *City of Milwaukee*. In that case, the Supreme Court, interpreting the scope and effect of the Federal Water Pollution Control Act (FWPCA) amendments of 1972, held that federal courts were not free to apply nuisance principles in the area of water pollution control when Congress has occupied the field with a comprehensive regulatory scheme. The Court cautioned that the judiciary's power to apply common-law principles was not preempted by the FWPCA; it simply could not coexist with a statutory framework Congress devised to treat the same problems. The substantive duties created by the FWCPA, the Court emphasized, cannot be augmented or diminished by common-law principles. *City of Milwaukee*, however, disapproved only of the *courts'* use of federal common law as a source for setting regulatory standards independent of those established by a comprehensive statutory scheme. The Court did not assail *Congress's* prerogative to empower the courts to apply common-law principles as part of an ongoing regulatory scheme.

Section 7003 is a congressional mandate that the former common law of nuisance, as applied to situations in which a risk of harm from solid or hazardous wastes exists, shall include new terms and concepts which shall be developed in a liberal, not a restrictive, manner. This ensures that problems that Congress could not have anticipated when passing the Act will be dealt with in a way minimizing the risk of harm to the environment and the public. *Cf., e.g., United States v. Price*, 523 F.Supp. 1055, 1069, 1070 (D.N.J.1981); *United States v. Diamond Shamrock Corp.*, No. C80–1857 (N.D.Ohio 1981).

## VII

■ The landfill group accurately states that although the Act was passed in 1976, regulations promulgated under it were, in

fact, not finally adopted until May 1980, some four months after this action was filed and eleven months after the Flemington landfill closed. It argues, therefore, that to grant the requested relief would be a retroactive application of the Act. Section 7003 does not, however, depend on regulations for its application. It became operative upon enactment without need for the promulgation of regulations. In fact, the regulations issued under the Act pertain to subtitle C and establish rules for safe management practices for persons handling hazardous wastes, not for situations covered by section 7003. The Flemington landfill was in operation for three years after the effective date of section 7003, so applying it to the landfill group has no retroactive effect.

### VIII

■ Contrary to the district court holding, we conclude on the peculiar facts of this case that permanent mandatory injunctive relief is an appropriate remedy. The landfill group argues that no emergency exists and that CERCLA provides an adequate remedy at law. The EPA need not prove that an emergency exists to prevail under section 7003, only that the circumstances may present an imminent and substantial endangerment. It has been alleged that an imminent and substantial endangerment exists. We make no finding on whether the EPA will be able to meet its burden at trial. Since this case came to us in the posture of an appeal from the grant of a Rule 12(b)(6) motion to dismiss, we have viewed all the evidence in the light most favorable to the party opposing the motion, the EPA.

Finally, the landfill group contends that an injunction cannot issue because CERCLA provides an adequate remedy at law. This lawsuit was not brought in common-law equity, however, but pursuant to an express statutory command giving the EPA an injunctive remedy. Congress chose to enhance the courts' traditional equitable powers in order to protect the public and the environment. *United States v.*

*Price,* 688 F.2d at 211. Any other decision would, in effect, interpret CERCLA as repealing the Act—a result obviously not intended by Congress.

For the reasons stated we reverse the district court's grant of the landfill group's motion to dismiss and remand for further proceeding consistent with this opinion.

REVERSED AND REMANDED.