**In re HEMINGWAY TRANSPORT, INC., Bristol Terminals, Inc., Debtors.**

**JUNIPER DEVELOPMENT GROUP, a Massachusetts Partnership and George D. Whitten, Amy Whitten. and Charles Whitten as Trustees of 60 Olympia Nominee Trust, Plaintiffs,**

v.

**Herbert C. KAHN, Trustee for Hemingway Transport, Inc., and Bristol Terminals, Inc. Defendants.**

**Herbert C. KAHN, Trustee for Hemingway Transport, Inc. and Bristol Terminals, Inc., Third–Party Plaintiffs,**

v.

**WOBURN ASSOCIATES, Third–Party Defendant.**

**Bankruptcy Nos. 82–1340–JNG, 82–1341–JNG. Adv. No. 86–1081.**

United States Bankruptcy Court, D. Massachusetts.

Dec. 18, 1989.

See also, Bkrtcy., 105 B.R. 171.

Louis N. Massery, Cooley, Manion, Moore & Jones, Boston, Mass., for plaintiffs.

William F. Macauley, Craig and Macauley, Boston, Mass., for trustee (defendant and third-party plaintiff).

Thomas V. Urmy, Jr., Shapiro, Grace & Haber, Boston, Mass., for third-party defendant.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

### I. FACTS

On October 17, 1989, this Court conducted an evidentiary hearing with respect to the CERCLA claim of Juniper Development Group ("Juniper") against the Trustee of Hemingway Transport, Inc. ("Hemingway") and Bristol Terminals, Inc. ("Bristol") (collectively "Hemingway"). Three witnesses testified during the hearing and nine exhibits were introduced into evidence. The parties[1] stipulated to the following relevant facts:

1. Juniper, Hemingway, Bristol and Woburn are "persons," as that term is defined by CERCLA. *See* 42 U.S.C.A. § 9601(21) (West 1983 & Supp.1989).

2. Woburn was an "owner," as that term is defined by CERCLA, of 60 Olympia Avenue ("the property") from June 26, 1974 to July 29, 1980. *Id.* at § 9601(20).

3. Hemingway leased the property from Woburn from June 26, 1974 to July 29, 1980.

4. Bristol, a subsidiary of Hemingway, was the "owner," as that term is defined by CERCLA, of the property from July 29, 1980 to May 18, 1983.

5. Juniper purchased the property from Bristol on May 18, 1983 and has been an "owner," as that term is defined by CERCLA, since that date.

6. To the extent that it is found that "hazardous substances" were "disposed of," as those terms are defined in CERCLA, on the property at the time Hemingway, Bristol and Woburn owned and/or operated the property then the property is a "facility," as that term is defined in CERCLA. *Id.* at § 9601(9).

7. To the extent that Juniper successfully establishes all of the other elements of Section 107(a)(4)(B) of CERCLA, the

---

1. Third-party defendant Woburn Associates ("Woburn") joined the stipulation, and was permitted to participate at the trial without objection by Juniper.

parties stipulate that all of the costs Juniper incurred relative to the services performed by Clean Harbors, Inc. and Geotechnical Engineers, Inc. were a) $30,208.02; b) as a result of a release or threatened release of hazardous substances; c) necessary; and d) consistent with the National Contingency Plan. *Id.* at § 9607(a).

George D. Whitten ("Whitten"), a general partner in Juniper Development Group was the first witness. He outlined the chronology of events that led to Juniper's acquisition of the 60 Olympia Avenue property. He also described the 21.4 acre parcel.

Whitten indicated that the property is composed of two lots. Lot 1 contains the truck terminal and associated industrial structures and is enclosed by a fence. This 6.6 acre rectangular parcel is located at the northeast corner of the property and is bordered by Olympia Avenue and the Aberjona River on the north and west sides, respectively. Lot 2, which contains approximately 13.8 acres of predominantly wetland, is "T"-shaped and bordered on the west side by MBTA railroad tracks. At the southwest corner of Lot 1, the Aberjona River, which separates the two lots and flows virtually due south to that point, assumes a serpentine configuration and flows in a southeasterly direction. Whitten testified that the barrels of toxic waste were found on Lot 2 at the juncture of the southern arm of the "T" and its base, approximately 100 yards from the railroad tracks and on the west side of the river. Whitten indicted that access to the location where the barrels were found from the terminal itself is virtually impossible because of the fence, the river and the swampy condition of the land. However, easy access to the location of the barrels is possible along the City of Woburn's sewer easement, which parallels the MBTA tracks. The location of the barrels strongly suggests to this Court, although the Court does not so find, that they did not emanate from the terminal facility, and, indeed, no allegation has ever been made 'that Hemingway was responsible for generating the toxic wastes in the barrels or for depositing them on the Olympia Avenue property.

Whitten testified that he first became aware of the barrels when he was contacted by a representative of the United States Environmental Protection Agency ("EPA"). He indicated that he climbed over a culvert and walked along the MBTA tracks to find the 55-gallon drums. Subsequently, the EPA, on December 30, 1985, sent Juniper a "Notification of Potential Liability Under Section 104 of CERCLA," which was followed, on or around February 6, 1986, by an Administrative Order. The order contains findings of fact and conclusions of law. Specifically, the order contains conclusions of law with respect to the presence, in the drums and soil, of "hazardous substances," as that term is defined in CERCLA, 42 U.S.C.A. § 9601(14), and the presence of an actual or threatened "release," *see Id.* § 9601(22), of those substances due to the past, present and potential migration of them at the site.[2]

Whitten testified that after receiving the Administrative Order, Juniper hired Clean Harbors, Inc. and Geotechnical Engineers, Inc. to perform cleanup activities. Juniper also hired Goldberg, Zoino & Associates ("GZA").

William Cashins ("Cashins"), an employee of the Division of Water Pollution Control, Massachusetts Environmental Protection Agency, was the second witness. (The Massachusetts Environmental Protection Agency was until recently known as the Department of Environmental Quality Engineering ("DEQE")). He indicated that on

---

**2.** Specifically, the following substances were found in the soil: 1, 1-Dichloroethane (11 parts per million (ppm)); 1, 1, 1-Trichloroethane (49 ppm); Trichloroethylene (390 ppm); Tetrachloroethylene (32 ppm); Toluenes (4.1 ppm); Xylenes (6.9 ppm); Chlordane (51,000 ppm); PCB AROCLOR (31,000 ppm). The following substances were found in the drums: (1, 1, 1-Trichloroethane (3ppm); Tetrachloroethylene (74 ppm); and Xylenes (6.1 ppm). According to the Administrative Order, Trichloroethylene, tetrachloroethylene, 1, 1, 1-dichloroethane, 1, 1, 1 trichloroethane, toluene and xylene will volatilize into the air or migrate from the soil into the ground water. . Chlordane and PCB's are persistent and stable in the environment.

August 15, 1980, he discovered 17 barrels of waste on the Olympia Avenue property while responding to a complaint made by a local cable TV company about barrels on or near the MBTA tracks. Cashins indicated that the barrels were rusted and that about one-half of them were overturned. Cashins observed, in his words, a semi-solid, tar-like substance that had flowed from the barrels on to the ground. Cashins obtained a sample of the material and requested an analysis of it. A document was submitted into evidence indicating that the sample collected by Cashins was received by the DEQE's Lawrence Experimental Station for "oil analysis." The results of the tests conducted by lab personnel in June of 1981 revealed the following: "it appears that wide cut gas oil, which includes lubricating oil, is present in the sample."

Cashins also testified about his contacts with Hemingway personnel and subsequent visits to the property. Additionally, correspondence between the DEQE and Hemingway was introduced into evidence. The testimony and exhibits revealed that on or about October 10, 1980, Hemingway was informed that "old barrels with hazardous waste and rubbish" were on the property and should be removed by a licensed hazardous waste contractor. By letter dated November 10, 1980, Hemingway responded to the DEQE letter assuring the DEQE of its full cooperation. Cashins subsequently toured the property with Larry Hall, Hemingway's Terminal Manager, who indicated he would get estimates from licensed contractors about the cost of removing the barrels. However, on February 9, 1981 and on April 6, 1981, when Cashins checked the area, the barrels had not been removed. Following an inspection that took place on August 10, 1982, Cashins learned from Hemingway's General Manager, Dave Butcher, that the company had filed a bankruptcy petition under Chapter 11.

The final witness was John J. Balco ("Balco") from Goldberg, Zoino & Associates. Mr. Balco's impressive credentials qualified him as an expert witness. He indicated that GZA prepared and modified a Project Operations and Investigation Plan for the Olympia Avenue site and monitored the clean-up. He testified that Juniper paid GZA $8,555.61 in conjunction with this work which was done pursuant to the Administrative Order and in a manner consistent with the National Contingency Plan. Balco also indicated that GZA was paid $1,967.60 for work done in 1989. That work consisted of reviewing the EPA's conclusions about the 60 Olympia Avenue property.

Balco testified that GZA was unable to determine precisely how and when ground water contamination occurred. However, he did indicate that certain of the toxic chemicals found in the barrels and soils could be entrained by rainwater, and that rainwater will percolate into the soil, resulting in contamination of the groundwater.

## II. LIABILITY

■ Pursuant to CERCLA, Juniper, in order to prevail in its action against the Trustee for necessary response costs, must prove that the Trustee owned or operated the facility "at the time of disposal of any hazardous substance." 42 U.S.C.A. § 9607(a)(2).

Since the parties have stipulated to the fact that there was a release or threatened release, assuming Juniper can establish the other elements of section 9607(a)(2)(B), and that the release caused Juniper to incur costs that were necessary and consistent with the National Contingency Plan, the Trustee's liability to Juniper turns on whether Hemingway owned or operated the property "at the time of disposal" of "hazardous substances."

According to section 101(29) of CERCLA, disposal "shall have the meaning provided in section 1004 of the Solid Waste Disposal Act." See 42 U.S.C.A. § 6901 et seq. (West 1983 & Supp.1989). Section 1004(3) of that Act provides that

[t]he term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent

thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C.A. § 6903(3).

The United States District Court for the District of New Hampshire has noted "[t]he definition of 'disposal' is quite broad. '[S]ignificantly, it includes within its purview leaking, which ordinarily occurs not through affirmative action but as a result of inaction or negligent past actions.'" *United States v. Ottati & Goss, Inc.*, 630 F.Supp. 1361, 1399 (D.N.H.1985), *quoting United States v. Price*, 523 F.Supp. 1055, 1071 (D.N.J.1981), *aff'd*, 688 F.2d 204 (3d Cir.1982). *See also Tanglewood East Homeowners v. Charles–Thomas, Inc.*, 849 F.2d 1568, 1573 (5th Cir.1988); *American Mining Congress v. United States Environmental Protection Agency*, 824 F.2d 1177, 1196 (D.C.Cir.1987); *United States v. Waste Industries, Inc.*, 734 F.2d 159, 165 (4th Cir.1984). The Fourth Circuit has determined that

> [t]he inclusion of "leaking" as one of the diverse definitional components of "disposal" demonstrates that Congress intended "disposal" to have a range of meanings, including conduct, a physical state, and an occurrence. Discharging, dumping, and injection (conduct), hazardous waste reposing (a physical state) and movement of the waste after it has been placed in a state of repose (an occurrence) are all encompassed in the broad definition of disposal. "Leaking" ordinarily occurs when landfills are not constructed soundly or when drums and tank trucks filled with waste materials corrode, rust, or rot. Thus "leaking" is an occurrence included in the meaning of "disposal."

734 F.2d at 164. Likewise, the Fifth Circuit has observed that the "definition of disposal does not limit disposal to a one-time occurrence-there may be other disposals when hazardous materials are moved, dispersed, or released during landfill excavations and fillings." 849 F.2d at 1573. Judge Mikva, in an dissenting opinion in another circuit case, stated:

This definition clearly encompasses more than the everyday meaning of disposal, which is a "discarding or throwing away." *Webster's Third International Dictionary* 654 (2d ed. 1981). The definition is *functional*: waste is disposed under this provision if it is put into contact with land or water in such a way as to pose the risks to health and environment that animated Congress to pass RCRA.

824 F.2d at 1196.

In view of the First Circuit's directive that "[s]tatutes such as CERCLA which were enacted for the protection and preservation of public health are to be given an extremely liberal construction for the accomplishment of their beneficial objectives," *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir.1986), the Court has no difficulty concluding that Hemingway was an owner of the property at the time of disposal, and that that time was co-extensive with the period of Hemingway's possession of the property both pre-and post-petition, as the drums, particularly those that were over turned and from which a tar-like substance was emerging, obviously were deteriorating and thus "leaking" due to their exposure to the elements over a period of years.

■ Section 101 of CERCLA defines "hazardous substance" as follows:

The term "hazardous substance" means (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6912] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Admin-

istrator has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C.A. § 9601(14) (West 1983 & Supp. 1989). In view of the exclusion of petroleum and crude oil from the definition of hazardous substances, counsel to Woburn, argued that Juniper failed to prove that hazardous substances were present at the time Hemingway owned or leased the property. Since the Administrative Order of February 6, 1986 contains a finding that hazardous substances were located in the drums and on the ground, acceptance of Woburn's argument would leave the Court with no choice but to find that the barrels found by William Cashins in August 1980, which according to the DEQE contained wide cut gas oil, were removed by some unknown force or agent and replaced with similar barrels containing hazardous substances. The Court is unable to accept this preposterous conclusion. Clearly, the chemical analysis conducted by the DEQE was expressly limited to an oil analysis and did not preclude the findings made by the EPA after more extensive and sophisticated testing of samples from the barrels and soil. Admittedly, there was no direct testimony that the 17 barrels found by Cashins contained hazardous substances in 1980. Nevertheless, the Court is compelled to conclude, since the barrels contained hazardous substances in 1986, that it is more likely than not that those substances were in the barrels in 1980 and leaked on to the ground, and that the hazardous substance on the ground were more likely than not to contaminate the soil and possibly the ground water due to their entrainment in rainwater.

III. ATTORNEYS' FEES

■ Juniper submitted as an exhibit copies of bills from its attorneys that it paid.

Citing *General Electric Company v. Litton Business Systems, Inc.*, 715 F.Supp. 949 (W.D.Mo.1989), it argues that attorneys' fees and prejudgment interest are recoverable as response costs. The Trustee disagrees, citing *inter alia State of Idaho v. Hanna Mining Co.*, 882 F.2d 392, 396 (9th Cir.1989); *Regan v. Cherry Corp.*, 706 F.Supp. 145, 149·(D.R.I.1989); and *T & E Industries, Inc. v. Safety Light Corp.*, 680 F.Supp. 696, 707 (D.N.J.1988). · The Trustee also notes that in the *General Electric* opinion the court failed to distinguish between government and private party actions in relying on its earlier opinion in *United States v. Northeastern Pharmaceutical and Chemical Co., Inc.*, 579 F.Supp. 823, 852 (W.D.Mo.1984), in which attorneys' fees were awarded to the United States government.

This Court has reviewed the case law surrounding the issue of whether attorneys' fees are recoverable as response costs in private party actions and is compelled to agree with the Trustee. As the court in *Regan* stated:

If Congress had intended to permit citizens seeking response costs to recover their attorney fees, it would simply have amended 107 to allow the recovery of these litigation costs. SARA was a comprehensive overhaul of CERCLA. Therefore, it would have been a simply matter to amend § 107 to allow recovery of attorney fees.

706 F.Supp. at 149. *See also T & E Industries, Inc.*, 680 F.Supp. at 707 ("[T]his court finds no indication that attorney fees and costs of litigation are recoverable by a private litigant.").

IV. CONCLUSION

■ In view of the fact that the Court has determined that the Trustee is liable to Juniper for response costs, excluding attorneys' fees, the remaining issue is whether the Trustee is responsible for those costs incurred by Juniper in addition to the $30,-208.02 paid to Clean Harbors, Inc. and Geotechnical Engineers, Inc., namely the sums of $8,555.61 and $1,967.60 paid to GZA. The Court after careful review of the Ad-

ministrative Order finds that the Trustee is liable for the former amount but not the latter. The Administrative Order expressly required the formulation of Project Operations and Investigation Plan, and Mr. Balco testified that the work done in preparing the plan and overseeing the work performed pursuant to the plan was consistent with the National Contingency Plan. However, the testimony relative to the $1,967.60 expenditure was vague. Therefore, the Court is unable to find that that expenditure was both necessary and consistent with the National Contingency Plan.

In accordance with the foregoing and the memorandum and arguments of counsel, the Court hereby enters judgment in favor of Juniper and against the Trustee in the amount of $38,763.63. Consistent with this Court's memorandum and order of May 8, 1987, this sum shall be accorded an administrative priority. The entry of this order shall constitute a denial of the Trustee's motion to reconsider that order.

See also, Bkrtcy., 87 B.R. 745.