**87TH STREET OWNERS CORP., Plaintiff,**

v.

**CARNEGIE HILL–87TH STREET CORPORATION, Defendant.**

**No. 00 Civ. 6016(GEL).**

United States District Court, S.D. New York.

Aug. 9, 2002.

Michael A. Freeman and Debra L. Rothberg, DL Rothberg & Associates, P.C., New York, NY, for Plaintiff.

Daniel Riesel, (David S. Yudelson and Kate Sinding, on the brief), Sive, Paget & Riesel, P.C., New York, NY, for Defendant.

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiff and defendant own two adjoining buildings on East 87th Street in Manhattan. The present dispute concerns the presence of oil in the ground under plaintiff's building. Plaintiff claims that the oil comes from a storage tank on defendant's property, and "may present an imminent

and substantial endangerment to health or the environment," within the meaning of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B); accordingly, it brings this action for abatement of the danger under RCRA and for damages under state tort law. Defendant moves for summary judgment and to strike plaintiff's demand for a jury trial. The motion for summary judgment will be granted, mooting the motion to strike the jury demand.

## I. *Liability under RCRA*

Defendant's primary argument is that it should be awarded summary judgment on plaintiff's RCRA claim, because plaintiff cannot establish an imminent and substantial endangerment to health or to the environment, and because any such endangerment has been eliminated by action of the New York State Department of Environmental Conservation ("DEC"). (Def.Mem.6–11.) If successful, this argument would terminate the litigation, because dismissal of RCRA claim would entail dismissal of the pendent state claims. 28 U.S.C. § 1367(c)(3); *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir. 1986). Although there are material issues of fact regarding the existence of an imminent and substantial danger within the meaning of RCRA, summary judgment for defendant will nevertheless be granted, because plaintiff has been unable to establish a need for injunctive relief, or even to suggest a form of injunctive relief that could abate whatever environmental danger may be present.

Summary judgment may only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(b). In considering a motion for summary judgment, ambigui-

ties must be resolved in favor of the non-moving party, although the nonmoving party cannot rely on conclusory allegations or unsubstantiated speculation. *See Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998). The court may not weigh the evidence or make credibility assessments, and is required to view the evidence in the light most favorable to the party opposing summary judgment and to draw all reasonable inferences in favor of that party. *See Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996).

This standard cannot be met with respect to the existence of an environmental hazard. The Second Circuit has given an expansive construction to RCRA:

Significantly, congress used the word "may" to preface the standard of liability: "present an imminent and substantial endangerment to health or the environment." *United States v. Price,* 688 F.2d 204, 213 (3d Cir.1982); *United States v. Waste Industries, Inc.,* 734 F.2d 159, 166 (4th Cir.1984). This is "expansive language," which is "intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes." *Price,* 688 F.2d at 213–14 (emphasis added).... [RCRA] is not specifically limited to emergency-type situations. *Waste Industries,* 734 F.2d at 165. A finding of "imminency" does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present: "An 'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public." *Environmental Defense Fund v. Environmental Protection Agency,* 465 F.2d 528, 535 (D.C.Cir. 1972) (quoting EPA Statement of Reasons Underlying the Registration Decisions).... In addition, a finding that an

activity may present an imminent and substantial endangerment does not require actual harm. [*Waste Industries, Inc.,* 734 F.2d 159.]

*Dague v. City of Burlington,* 935 F.2d 1343, 1355–56 (2d Cir.1991), *rev'd in part on other grounds,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (reversing as to attorney fee award). Courts in this circuit have consistently followed this approach. *See, e.g., Aiello v. Town of Brookhaven,* 136 F.Supp.2d 81, 115 (E.D.N.Y. 2001); *Kara Holding Corp. v. Getty Petroleum Marketing, Inc.,* 67 F.Supp.2d 302, 310 (S.D.N.Y.1999). Thus, plaintiff need not prove that health or the environment has been harmed already, or even that such actual harm is "imminent" in the ordinary sense. The statute authorizes injunctive relief "to eliminate any risk posed by toxic wastes ... so long as the risk of threatened harm is present." *Dague,* 935 F.2d at 1356.

■ In this case, although the source of the contamination is hotly disputed, and plaintiff may eventually prove unable to establish that defendant is responsible, it is undisputed that fuel oil remains present in the subsurface of plaintiff's building. (Reisel Aff. ¶ 66; Ex. 33 at 15; Ex. 2 at 2–10) There is also substantial evidence that additional oil is present under defendant's building, and there is expert testimony that this oil could escape. (Ex. 1; Ex. 2 at 2–1, Ex. 33 at 15; Ex. 25 at 18.) The record contains considerable evidence, moreover, that petroleum vapor attributable to the oil problem under plaintiff's building has been a problem for the residents there. (Ex. 27, Ex. 28, Ex. 29 at 22–24.)

■ Defendant makes two principal arguments in support of summary judgment. First, it argues that plaintiff has not produced an expert witness regarding toxicological damage to human health or to flora, fauna or natural resources. (Def.Mem.8–9.) No legal rule, however, requires a plaintiff to present expert testimony to survive summary judgment in a RCRA case. Evidence of ground water contamination by oil, such as is present in the record here, could itself support a finding of environmental harm, *Kara Holding Corp. v. Getty Petroleum Marketing,* 67 F.Supp.2d 302 (S.D.N.Y.1999), and there is evidence of such contamination here. (Ex. 25 at 18, Ex. 33 at 15.) Nor is the Court prepared to rule as a matter of law that no reasonable factfinder could determine that oil contamination of the subsurface of a residential building with accompanying fumes presents a "risk of threatened harm" to health or the environment. Indeed, the DEC seems to have found the situation harmful enough to have invested considerable time, effort and expense in investigating and attempting to correct the situation.

■ Second, defendant argues that the presence of the DEC itself defeats the RCRA claim, because the DEC has already solved any environmental problem at the site. (Def.Mem.9–10, 23.) It is certainly true that RCRA does not permit a citizen suit for damages for past environmental harm, and authorizes only prospective relief to address threatened future harm. *Meghrig v. KFC Western,* 516 U.S. 479, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). However, DEC's efforts on the site are ongoing, and have not yet resulted in elimination of the offending condition. DEC continues to pursue remediation efforts, and there is at a minimum an issue of fact as to whether its efforts have as yet eliminated a risk of harm. Nor is there any legally enforceable right, on the part of plaintiff or anyone else, to require the DEC to keep in place its remedial systems, which are removing petroleum from the subsurface and countering petroleum fumes. Nor has the DEC undertaken any

legal action to require plaintiff or defendant to abate any harmful condition at the site. *Cf.* 42 U.S.C. § 6872(b)(2)(i) (citizen suits precluded when state agency has commenced suit for abatement). Cases such as *Meghrig,* 516 U.S. 479, 116 S.Ct. 1251, *Price,* 39 F.3d 1011, and *Avondale Federal Savings Bank v. Amoco Oil Co.,* 170 F.3d 692 (7th Cir.1999), relied on by defendant, are thus distinguishable, since in those cases the state agency had concluded that remediation either had been completed or was unnecessary.[1] As the Court held in *Kara Holding,* notwithstanding "efforts to remediate any pollution attributable to [petroleum] spillage," endangerment that may justify RCRA relief continues to exist until "the cleanup is complete." 67 F.Supp.2d at 311–12.

None of this is to say that plaintiff has established, or is likely to establish, liability. In addition to a substantial factual dispute as to whether the oil came from defendant's premises at all, the arguments presented by defendant go far to refuting plaintiff's claim of an ongoing risk of environmental harm. But even in an equitable matter, where the Court itself will sit as fact-finder, summary judgment on a cold record is inappropriate where conflicting inferences are possible and a full trial could elucidate the matter.

## II. *Equitable Relief*

 Thus, material issues of fact exist that might permit the Court, upon a full record, to find that defendant "has contributed . . . to the past or present handling . . . or disposal of any . . . hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). The question that then arises, however, is:

what would the plaintiff have the Court do about the situation? There is no doubt that RCRA gives the Court broad equitable powers; the statute authorizes the Court "to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both." 42 U.S.C. § 6972(a). Thus, the Court may not only "restrain" a defendant from doing whatever it is doing with hazardous waste that creates the environmental danger, but may also order it take any "action" that "may be necessary" to abate that danger. *See, e.g., Dague v. City of Burlington,* 732 F.Supp. 458, 472 (D.Vt.1989) (ordering closing of landfill).

Broad as these powers may be, however, they are granted for a particular purpose. The Court may only "restrain" the hazardous waste handling or disposal that "may present an imminent and substantial endangerment to health or the environment," or order actions that may be "necessary" to eliminate that danger. Here, since the actions that allegedly created the danger are in the past, and there is no allegation that defendant is currently engaged in any action that presents a risk to public health or the environment, there is nothing to "restrain." And, despite repeated requests from the Court, plaintiff has been unable to describe a single action that defendant could be ordered to take to reduce or eliminate any risk its past actions may have caused, that is not already being undertaken by DEC. (5/31/02 Tr. at 15–30.)

As noted above, a reasonable fact-finder might be able to determine that the pres-

---

**1.** Nor does it matter that the allegedly offending storage tank has been removed. For RCRA liability, "the endangerment must be ongoing, but the conduct that created the endangerment need not be." *Connecticut Coastal Fishermen's Assn. v. Remington Arms Co.,* 989 F.2d 1305, 1316 (2d Cir.1993).

ence of the DEC has not completely resolved the danger to health and the environment. Nevertheless, in order to obtain injunctive relief, plaintiff would have to identify some action that defendant could be ordered to take that is not already in place thanks to the action of the state agency and that would improve the situation in some way. Confronted with this problem, counsel for plaintiff initially responded, "The DEC is currently operating the system. You could order the defendant to physically go out there, hire a consultant, take over the maintenance of the system, do whatever else DEC would require in order to obtain closure of the spill." (*Id.* at 16; *see also id.* at 24–25 (similar answer).) But ordering defendant to take over operation of the system that has been installed by DEC to ameliorate the effects of the spill would do nothing to improve the operation of that system; plaintiff does not contend that DEC is not competent to operate the system or that an unspecified "consultant" hired by plaintiff would do a better job. Nor is ordering defendant to "do whatever else DEC would require" a meaningful exercise of the Court's equitable power. There is no suggestion that defendant has not cooperated with DEC to date, or that DEC believes something else can or should be done by it or by defendant that would reduce the danger posed by the oil contamination below the level achieved by its present efforts. While plaintiff's counsel suggested that "the DEC will ultimately make a determination whether this system is enough or whether there is more to do" (*id.*), it is entirely speculative at this point whether DEC will conclude that further steps are necessary, or whether, if it does so conclude, it will itself undertake such steps as it believes necessary, as it has done so far in dealing with the site.

Pressed further on this issue, plaintiff's counsel repeatedly stated that he was unable to identify steps defendant could take to improve the situation:

> There·is no way to say today what the final remedy is going to be. The DEC is out there. They have spent public moneys to do what they felt was necessary at the time.... So I am not in a position to say today that this will be the be-all/end-all remedy installed by the DEC.... Your Honor, it is difficult for me to sit here today and say what it is that the DEC will ultimately require and what the conditions will ultimately require.... There is a system in place which is working now. The system could be in place for 15, 20 years and not complete the problem, and then there will be a different remedy that is required. That could happen in six months. The DEC could say, oh, now that we have a private responsible party involved, let's do the full-scale remedy and order the responsible party to go out there and hire a consultant and do a full-scale investigation and install an appropriate system.

(*Id.* at 20–21.) Once again, plaintiff's argument is unspecific and speculative, and describes actions that might perhaps be taken by DEC rather than actions that plaintiff is requesting the Court to order defendant to perform. Of course, the details of remedial orders may often be fleshed out as a result of a full trial, and plaintiffs are not required to present in advance of trial a detailed draft of the injunction that they expect a court to enter at the end of the case. But given the limited jurisdiction conferred by RCRA, which extends only to ordering such actions as are necessary to correct a potential "imminent and substantial endangerment to health or the environment," a plaintiff cannot require the Court to conduct a full trial in the hope that some idea might then turn up as to what relief could be available. Plaintiff's response to the

Court's questions confirms that the state environmental authorities are already doing whatever can be done, and assumes that if there is anything more that could be done, it would be up to those authorities to identify that action. Plaintiff has identified nothing whatsoever that this Court could order defendant to do to supplement the DEC's efforts.

Defendant argues that the true dispute between the parties is not about what needs to be done to clean up the site, but about who will ultimately be held responsible for paying for the efforts that DEC has undertaken. (*Id.* at 10.) The Court's RCRA jurisdiction extends only to the provision of injunctive relief to remove, to the extent possible, the danger to health and safety, not to determine blame for the condition in order to determine who is responsible, under state law, for reimbursing the state for actions taken by state agencies that have already done everything that can be done to improve the situation. Directly asked "Is there anything else that you are asking for other than for [defendant] to pay the state for what the state is already doing?", plaintiff replied, "The answer is today, as I said, I do not have the crystal ball to figure out what the answer to that question is, whether there is an additional system required at this time." (*Id.* at 24.)

But it does not take a crystal ball to determine what needs to be done, and what the defendant can therefore be ordered to do, today. If plaintiff is concerned with what might need to be ordered to deal with some danger that might exist at some unspecified point in the future, should DEC abandon the systems it has put in place to ameliorate the risks posed by the oil contamination, or with the possibility that improved remedial measures might become available some day to effectuate a more fundamental clean-up (which DEC might or might not undertake), its suit is premature. Plaintiff can bring an action when and if these events come to pass, and when and if plaintiff can identify actions that defendant can be ordered to take to remove the danger. But that time has not yet come.

In a last effort to identify injunctive relief that could be available, plaintiff argued that the issue was not just who would have to pay the state for the system that had been installed, but who would have to continue to operate the system: "We do not want to be in a position where we are operating a system that has been installed, where that system needs to be modified. It is not that straightforward ... where you just pay a contractor and it is just money. There are decisions that have to be made.... We don't want to be responsible for operating a system where there is discretion involved, where there could be additional liabilities involved." (*Id.* at 27, 29.) But plaintiff is not now responsible for operating the system. As the colloquy continued:

THE COURT: Right now you are not responsible for it. Right now the state is.

[COUNSEL FOR PLAINTIFF]: But the DEC is in a position right now where it is operating on an interim basis. They don't operate in perpetuity where there are viable parties that would be responsible for operating it.... [What we are asking the Court to do] is not to usurp the authority of the DEC. The DEC is going to ultimately be the party that says you are pulling enough oil out or you are not pulling enough oil out, this is the proper remedy or it is not the proper remedy. So I don't think that is what the Court has to order.

What we are looking for this Court to order is that it be the responsible party, that it be the defendant who manages the oil that is coming into the building so

that when it is pulled out of the ground it is properly handled.

(*Id.* at 29–30.)

This answer presents the same problems as plaintiff's earlier efforts; indeed, it effectively concedes defendant's point about the real purposes of the litigation. First, the relief being requested is not something that is necessary now, but something that might speculatively be necessary at an unpredictable future point. Second, the relief suggested is not about improving or eliminating any hazard that might continue to exist at the site, but about determining responsibility, both financial and operational, for the measures, already in place, that appear to be accomplishing all that can be accomplished toward that goal. What plaintiffs really seek is an intervention by the federal Court to preempt whatever decision the state administrative agency might make to impose such responsibility on either plaintiff or defendant. That is not the purpose for which Congress provided the Court with jurisdiction to order injunctive relief under RCRA.

Accordingly, plaintiff has presented no basis for granting injunctive relief under RCRA; indeed, it has not even requested any specific, meaningful injunctive remedy. Summary judgment accordingly will be granted for defendant on that claim. Of course, this decision is without prejudice to any action plaintiff might bring at some future point, if it can show that given a change in circumstances, an injunction directing defendant to take some specific action to eliminate a danger to the public health or to the environment is required.

### III. *State Law Claims*

■ Defendant also seeks dismissal of plaintiff's state-law claims, on several grounds. With the dismissal of RCRA claims, however, there is no longer an independent basis for federal jurisdiction, since the parties are both New York corporations. Under 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction ... if ... [it] has dismissed all claims over which it has original jurisdiction."

The Court declines to exercise supplemental jurisdiction here. This is the preferred course when all federal claims have been dismissed pre-trial: "If it appears that the federal claims are subject to dismissal under F.R. Civ. P. 12(b)(6) or could be disposed of on a motion for summary judgment under F.R. Civ. P. 56, the court should refrain from exercising pendent jurisdiction absent exceptional circumstances." *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (2d Cir.1974). Declining jurisdiction is particularly appropriate here, where defendant's motion to dismiss raises difficult issues of state law more appropriately addressed to the state courts.

First, defendant argues that these claims are time-barred, because plaintiff discovered the contamination as early as 1988, and did not bring suit until 2000. NYCPLR § 214–c provides that New York's three-year statute of limitations on actions seeking damages for the "latent effects of exposure to any substance" shall not begin until "the date when through the exercise of reasonable diligence, such injury should have been discovered by the plaintiff." Defendant accordingly argues that the limitations period for plaintiff's state-law claims began to run in 1988, and had long since run before this suit was filed.

Plaintiff, however, plausibly contends that this argument turns § 214–c on its head. That statute was "enacted to 'provide relief to injured New Yorkers whose claims would otherwise be dismissed for untimeliness simply because they were unaware of the latent injuries until after the limitation period had expired.' " *Jensen v.*

*General Electric Co.,* 82 N.Y.2d 77, 84, 603 N.Y.S.2d 420, 623 N.E.2d 547 (1993). Thus, the statute appears to *remove* the shield of the statute of limitations in cases where damage done, say, in 1988 could not reasonably have been discovered until 2000. It does not appear to *interpose* a shield for damages caused from 1997–2000 where the plaintiff was aware of earlier damages emanating from the same source.

If § 214–c were interpreted as defendant wishes, property owners would be compelled to bring suits at the first sign of any environmental harm, however trivial or however likely to be quickly and voluntarily remediated, to forestall the dismissal of future litigation if and when the condition proved more serious. While it seems unlikely that New York's legislators intended such a result, the proper interpretation of the statute, and of the state-court precedent that has developed around it, are more appropriately addressed by the state courts, which are far more familiar with the issues involved.

Second, defendant argues that plaintiff's claims of diminished property value, the source of the damages claimed for the alleged state-law violations, are insufficiently supported by evidence. Essentially, defendant claims that the report of plaintiff's expert appraiser should be excluded from evidence pursuant to Fed. R.Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), because it is based on an unreliable methodology. While this appears on its face to be a question of federal evidence law, the question is closely connected to the state law of damages. It is a plausible inference that a buyer with a choice of comparable residential properties, one with and one without a history of fuel oil contamination, would pay more for the uncontaminated property. Such "stigma damages" have been recognized as a valid category of damages by the New York courts in environmental cases. *See, e.g., Commerce Holding Corp. v. Town of Babylon,* 88 N.Y.2d 724, 732, 649 N.Y.S.2d 932, 673 N.E.2d 127 (1996). The nature of the showing, by expert testimony or otherwise, that is necessary to obtain such damages is a question of state law, and absent an independent basis for federal jurisdiction, it would be undesirable for the fate of a claim arising solely under state law to turn in substantial part on federal evidentiary rules.

Without a surviving federal claim, plaintiff's state-law claims should be brought in the state courts, and are, accordingly, dismissed for lack of jurisdiction.

### CONCLUSION

For the reasons stated above, defendant's motion for summary judgment on plaintiff's RCRA claim is granted, and plaintiff's state-law claims are accordingly dismissed for lack of jurisdiction. Defendant's motion to strike the demand for a jury trial is denied as moot.

SO ORDERED.