In re HEMINGWAY TRANSPORT,
INC., et al., Debtors.

JUNIPER DEVELOPMENT GROUP,
etc., et al., Appellants,

v.

Herbert C. KAHN, etc., Appellee.
(Two Cases)

In re HEMINGWAY TRANSPORT,
INC., et al., Debtors.

JUNIPER DEVELOPMENT
GROUP, etc., et al.,

v.

Herbert C. KAHN, etc., Appellant.

In re HEMINGWAY TRANSPORT,
INC., et al., Debtors.

JUNIPER DEVELOPMENT GROUP,
etc., et al., Appellees,

v.

Herbert C. KAHN, etc., Appellant.

Nos. 92–1040, 92–1095, 92–
1289 and 92–1290.

United States Court of Appeals,
First Circuit.

Heard July 31, 1992.

Decided May 4, 1993.

Roy P. Giarrusso with whom Louis N. Massery and Cooley, Manion, Moore & Jones, P.C., Boston, MA, were on brief, for appellants.

William F. Macauley with whom Martin P. Desmery and Craig and Macauley, Boston, MA, were on brief, for appellee.

Martin P. Desmery, Boston, MA, for trustee appellee in cross-appeal.

Before TORRUELLA, CYR and BOUDIN, Circuit Judges.

CYR, Circuit Judge.

The bankruptcy court disallowed the contingent claim Juniper Development Group ("Juniper") filed against the consolidated chapter 7 estate of Hemingway Transport, Inc. ("Hemingway") and Bristol Terminals, Inc. ("Bristol") for anticipated response costs for the removal and remediation of hazardous substances discovered on property previously purchased by Juniper from the Hemingway–Bristol chapter 11 estate. Juniper's companion claim for cleanup-related attorney fees was disallowed as well. The district court affirmed and Juniper appeals. The chapter 7 trustee ("trustee") cross-appeals the allowance of Juniper's priority claim for past cleanup costs as an administrative expense.

# I

# BACKGROUND

Between 1963 and 1982, Hemingway and Bristol continuously owned or operated a trucking business conducted from a twenty-acre parcel of land located in Woburn, Massachusetts ("facility").[1] In May 1980, the Massachusetts Department of Environmental Quality Engineering (DEQE) discovered seventeen corroded drums leaching a semi-solid, tar-like substance onto a 13.8 acre "wetlands" area at the facility. DEQE informed Hemingway that the substance contained petroleum constituents. DEQE received assurances from Hemingway that the drums would be removed. The drums were still at the facility when DEQE conducted its last site inspection, in August 1982.

In July 1982, Hemingway and Bristol filed chapter 11 petitions. With the approval of the bankruptcy court, appellant Juniper, a local land developer, purchased the facility from debtor-in-possession Bristol for $1.6 million on April 29, 1983. Prior to the purchase, Juniper's representatives conducted an on-site inspection but did not walk the

---

1. Hemingway began business operations at the facility shortly after acquiring it in 1963. In 1974, Hemingway sold the facility to Woburn Associates, but continued to occupy it under a leaseback arrangement with Woburn. In 1980, Bristol, a wholly owned Hemingway subsidiary, acquired the facility from Woburn.

wetlands area where DEQE had discovered the drums; Juniper contends that the area was submerged at the time. Seven months after the sale, the Hemingway–Bristol chapter 11 reorganization proceeding was converted to a chapter 7 liquidation proceeding, and a chapter 7 trustee was appointed.

In April 1985, drums containing various solvents and pesticides classified as "hazardous substances" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9657, 9601(14) (1981), were discovered at the facility, in the *same wetlands area,* by the United States Environmental Protection Agency ("EPA"). The following December, Juniper, then the "owner" of the facility, received notice that the EPA considered Juniper a "potentially responsible party" ("PRP") under CERCLA, *see id.* § 9607(a). Shortly thereafter the EPA issued an administrative order requiring Juniper to remove the hazardous substances from the facility at its own expense. *See id.* § 9606. Juniper claims $92,088 in response costs incurred pursuant to the EPA administrative order.[2]

Juniper initiated an adversary proceeding against the Hemingway–Bristol estate for CERCLA response costs already incurred under the EPA administrative order and for future response costs required to complete the anticipated cleanup and remediation. Initially, the bankruptcy court denied the trustee's motion for summary judgment on Juniper's CERCLA claim. The court determined that Juniper's CERCLA claim, if ultimately allowed, would be entitled to priority payment from the chapter 7 estate as an administrative expense of the chapter 11 estate, since Juniper's exposure to CERCLA liability had arisen from its postpetition agreement to purchase the facility from the chapter 11 estate. *In re Hemingway Transp., Inc.,* 73 B.R. 494, 505 (Bankr. D.Mass.1987) (citing *Reading Co. v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968)).[3]

The trustee renewed the motion for summary judgment on Juniper's claim for *future* response costs, and moved for reconsideration of the "administrative expense priority" ruling previously entered by the bankruptcy court. The bankruptcy court then disallowed Juniper's claim for *future* response costs, pursuant to Bankruptcy Code § 502(e)(1)(B), 11 U.S.C. § 502(e)(1)(B), on the ground that Juniper was the holder of a contingent CERCLA contribution claim based on a debt owed EPA for which Juniper, Hemingway, and Bristol were jointly and severally liable, in connection with which Juniper had yet to incur any liability by the time of the allowance of its claim. *In re Hemingway Transp., Inc.,* 105 B.R. 171, 176–78 (Bankr. D.Mass.1989). The bankruptcy court reaffirmed its earlier ruling entitling Juniper to administrative expense priority on its claim for *past* response costs.

Following trial on Juniper's $92,088 claim for CERCLA response costs previously incurred, the bankruptcy court ruled that Hemingway and Bristol were responsible

**2.** Juniper alleges that an engineering firm was paid $30,208 to remove the drums; an environmental consulting firm was paid $7,880 to monitor the removal action; and a law firm was paid $54,000 to ensure adequate compliance with the EPA order.
 In April 1988, EPA demanded $2.1 million in CERCLA contribution from Juniper for costs incurred by EPA in assessing and evaluating the site. The PRP notice advised that Juniper would be notified of future "cleanup response costs" as well. In February 1989, EPA sent PRP notices to Hemingway and Bristol, as former owner-operators of the facility. *See infra* note 9.

**3.** Although count I of the original Juniper complaint did not assert a right to CERCLA contribution, when the trustee's motion for summary judgment on count I was denied the bankruptcy court allowed Juniper to amend count I to assert a claim for contribution under 42 U.S.C. § 9607(a). *In re Hemingway Transp.,* 73 B.R. at

507–08. *See also infra* note 20. The court entered summary judgment for the trustee on count II, which alleged a breach of warranty by Bristol, and on Count III, which sought rescission of the land-sale agreement on the ground of fraudulent misrepresentation. As to count II, the bankruptcy court held that Juniper had forfeited any right to recover for breach of warranty by representing in the contract that it had "made all such inspections of the premises as [it] wishe[d] to make." *Id.* at 506. As to count III, the bankruptcy court held that Juniper failed to allege fraud with the requisite particularity. *Id.* (holding that Massachusetts law requires more than proof of the seller's nondisclosure of a known defect; it requires proof that the seller deliberately concealed, or prevented the buyer from discovering, known defects). Juniper does not challenge this bankruptcy court ruling.

parties "liable" to the EPA, as they either owned or operated the facility at the time a passive "disposal" of hazardous substances occurred at the facility. *In re Hemingway Transp., Inc.*, 108 B.R. 378, 380 (Bankr. D.Mass.1989) (holding that CERCLA liability arising from "disposal" need not result from affirmative acts, but encompasses "leaking" of previously deposited waste during PRP's ownership) (citing *United States v. Waste Indus., Inc.*, 734 F.2d 159, 164 (4th Cir. 1984)). Significantly, however, the bankruptcy court noted no evidence that Hemingway or Bristol, notwithstanding their continuous ownership or possession of the facility for a period of twenty years, either generated or deposited hazardous wastes at the facility. *Id.* at 380.

The bankruptcy court allowed Juniper's claim for past response costs in the amount of $38,763 as an administrative expense entitled to priority payment, *id.* at 382, but disallowed the $54,000 claim on the ground that attorney fees are not recoverable in a private action under 42 U.S.C. § 9607(a)(4)(B). *Id.* at 383. Juniper appealed the rulings disallowing its claim for future response costs and for attorney fees. The trustee cross-appealed the order allowing Juniper's $38,763 priority claim for administrative expense. The district court affirmed. *In re Hemingway Transp., Inc.*, 126 B.R. 656 (D.Mass.1991).

## II

## DISCUSSION

A. *Juniper's Appeal: Disallowance of Future Response Costs (11 U.S.C. § 502(e)(1)(B).*

1. **The Intersection of CERCLA and the Bankruptcy Code.**

 Juniper finds itself stranded at the increasingly crowded "intersection" between the discordant legislative approaches embodied in CERCLA and the Bankruptcy Code. *See In re Chateaugay Corp.*, 944 F.2d 997, 1002 (2d Cir.1991). CERCLA's settled policy objectives, reemphasized in the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), prominently include the expeditious cleanup of sites contaminated or threatened by hazardous substance releases which jeopardize public health and safety, and the equitable allocation of cleanup costs among all potentially responsible persons ("PRPs"). *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 90–91 (1st Cir. 1990); *see also B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir.1992). The PRP class broadly encompasses, *inter alia*, past and current owners or operators of a contaminated facility. *See* 42 U.S.C. § 9607(a). To foster CERCLA's primary objective—promotion of spontaneous private cleanup initiatives—all PRPs are deemed strictly liable for the total response costs required to remediate the contaminated facility. *See United States v. Kayser–Roth Corp.*, 910 F.2d 24, 26 n. 3 (1st Cir.1990), *cert. denied*, 498 U.S. 1804, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991). Strict liability is normally both joint and several. *See O'Neil v. Picilli*, 883 F.2d 176, 178 (1st Cir.1989), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); *see also New York v. Shore Realty Corp.*, 759 F.2d 1032, 1042 (2d Cir.1985).[4] And the EPA is invested with broad administrative discretion to compel PRPs to undertake immediate cleanup measures, a prerogative largely insulated from judicial review at the pre-enforcement stage. *See* 42 U.S.C. § 9606; *see also* 42 U.S.C. § 9613(f) (PRPs who settle with EPA are immune from subsequent contribution claims); *In re CMC Heartland Partners*, 966 F.2d 1143, 1148 (7th Cir.1992).

4. The defendant in an EPA enforcement action would have an especially heavy burden to establish that the shared responsibility of the PRPs is divisible, so as to elude imposition of joint and several liability. *Cf. O'Neil*, 883 F.2d at 178–79 ("[R]esponsible parties rarely escape joint and several liability [because] it is [often] impossible to determine the amount of environmental harm caused by each party."); *see also United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 808–10 (S.D.Ohio 1983). However, in a CERCLA contribution action *among* responsible parties who are jointly and severally liable, the burden of proof is less demanding, though the court nevertheless may undertake a comparable allocation of the relative responsibilities of the joint obligors. *See* 42 U.S.C. § 9613(f)(1) ("[T]he court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."); *see also Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 90 (3d Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989). In approaching

■ At the same time, however, CERCLA section 9613(f) is aimed at promoting equitable allocations of financial responsibility by authorizing PRPs subjected to pending or completed EPA enforcement actions under 42 U.S.C. §§ 9606 and 9607(a)(4)(A) to initiate private actions for full or partial *contribution* from nonsettling PRPs by way of impleader or an independent action. *See* 42 U.S.C. § 9613(f).[5] Thus, targeted PRPs, relying on the ultimate financial accountability of more "culpable" PRPs, are encouraged to initiate prompt response efforts, at their own expense, in cooperation with the EPA. *See* H.R.Rep. No. 253, 99th Cong., 1st Sess. 80, *reprinted in* 1986 U.S.C.C.A.N. 2835 ("Private parties may be more willing to assume the financial responsibility for some or all of the cleanup if they are assured that they can seek contribution from others."); *In re Dant & Russell, Inc.*, 951 F.2d 246, 248 (9th Cir. 1991).

On the other hand, Bankruptcy Code § 502(e)(1)(B) often serves to forestall CERCLA's intended equitable allocation of responsibility, as occurred in this case when the bankruptcy court disallowed Juniper's estimated claim for $6.2 million in anticipated future CERCLA response costs. Section 502(e)(1)(B) provides, in pertinent part:

[T]he court shall disallow any claim for reimbursement or contribution of an entity [*viz.*, Juniper] that is liable with the debtor [Hemingway–Bristol] on or has secured, the claim of a creditor [EPA], to the extent that—

. . . .

(B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution. . . .

11 U.S.C. § 502(e)(1)(B). There can be little doubt that, but for section 502(e)(1)(B), the Hemingway–Bristol estate would share some measure of financial responsibility for the anticipated $6.2 million in future response costs on which the Juniper claim is based.

Nevertheless, section 502(e)(1)(B) would mandate disallowance of the Juniper claim against the Hemingway–Bristol chapter 7 estate if Juniper is jointly liable with the Hemingway–Bristol estate on the *same* "debt" for estimated future CERCLA response costs to EPA, and Juniper's right to payment on its claim—denominated a claim for reimbursement or contribution—remained "contingent" at the time of its disallowance. *See In re Provincetown–Boston Airlines*, 72 B.R. 307, 309 (Bankr.M.D.Fla.1987). The bankruptcy court, citing *In re Charter Co.*, 862 F.2d 1500 (11th Cir.1989), held that the Juniper claim met all three criteria for disallowance under section 502(e)(1)(B). First, Juniper denominated its claim as one for "indemnification"

---

these divisibility and apportionment determinations, the courts have relied on various guideposts, including the legislative history in general, and the so-called "Gore Factors" in particular:
 (i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;
 (ii) the amount of the hazardous waste involved;
 (iii) the degree of toxicity of the hazardous waste involved;
 (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
 (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and
 (vi) the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment.
*Environmental Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 508–09 (7th Cir.1992) ("Gore fac-

tors" provide a nonexhaustive but valuable roster of equitable apportionment considerations) (quoting *United States v. A & F Materials Co., Inc.*, 578 F.Supp. 1249, 1256 (S.D.Ill.1984)).

5. Section 9613(f)(1) provides:

Any person may seek contribution from any other person who is liable or potentially liable under section [9607(a)], during or following any civil action under section [9606] or under section [9607(a)]. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section [9606] or section [9607].
42 U.S.C. § 9613(f).

or "contribution." *But see infra* note 22. Second, Juniper and Hemingway–Bristol are "liable" to the EPA for future CERCLA response costs (hereinafter: the "EPA debt") because all three entities were designated PRPs by the EPA. Third, the Juniper claim is "contingent" because the EPA has issued no further cleanup orders against Juniper; hence, additional cleanup of the facility *may* not be required. *In re Hemingway Transp.*, 105 B.R. at 177–78.

### 2. Applicability of Section 502(e)(1)(B) to CERCLA Claims.

Section 502(e)(1)(B) was enacted for one purpose—"to prevent[ ] *competition between a creditor and his guarantor* for the limited proceeds of the estate." H.R.Rep. No. 595, 95th Cong., 1st Sess. 354 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 65 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5851, 6310 (emphasis added). Normally, section 502(e)(1)(B) is invoked against claims based on debts or obligations arising from voluntary contractual relationships. Even in the context of a CERCLA-based, quasi-"tort" obligation, however, the practical need for section 502(e)(1)(B) is evident; that is, but for section 502(e)(1)(B), *see infra* note 6, an estimation of Juniper's claim for anticipated response costs, *see* 11 U.S.C. § 502(c)(1), would entitle Juniper to share in the distribution of the insolvent chapter 7 estate under Bankruptcy Code § 726(a), 11 U.S.C. § 726(a), *see, e.g., In re Butterworth*, 50 B.R. 320, 322 (Bankr.W.D.Mich.1984), notwithstanding that its claim remained "contingent" until such time (if ever) as EPA were to call upon Juniper to pay any future CERCLA response costs incurred for further cleanup or remediation of the facility.

The Code's expansive definition of "claim" permits automatic allowance of most "contingent" claims, *see* Bankruptcy Code §§ 101(4), 502(a), 11 U.S.C. §§ 101(4), 502(a), against a chapter 7 estate upon timely filing, *see id.* §§ 501, 726; Fed.R.Bankr.P. 3002(c). The bankruptcy court simply estimates the amount of the claim for purposes of its allowance, *see id.* § 502(c)(1), discounting its value to reflect the uncertainty of the contingency, in order to enable the holder to share in the distribution of the insolvent estate.[6] On the other hand, where the filing of a contingent claim for contribution or reimbursement entails risk that the assets of the chapter 7 estate will be exposed to "double-dipping" by holders of the same underlying claim against the estate, section 502(e)(1)(B) mandates disallowance of the contingent claim. The sole purpose served by section 502(e)(1)(B) is to preclude redundant recoveries on identical claims against insolvent estates in violation of the fundamental Code policy fostering equitable distribution among all creditors of the same class. The "double-dipping" threat in the present case would result from the allowance and estimation of Juniper's contingent claim, and the allowance of an EPA claim, for the same future CERCLA response costs against the chapter 7 estate.

Section 502(e)(1)(B) is a fair and reasonable measure as applied against a contract guarantor or surety. Confronted with the prospect that its contingent claim for reimbursement or contribution against a chapter 7 debtor estate may be subject to disallowance under section 502(e)(1)(B), an entity may elect to cause its contingent contract claim to become "fixed" prior to disallowance, *see* Bankruptcy Code § 502(e)(2), by

---

**6.** Under CERCLA § 9607(a)(4)(B), *see* pp. 930–31 *infra*, "contribution" relief is restricted to damages for *past* response costs (*i.e.*, costs already "incurred"). On the other hand, section 9613(g)(2) authorizes a declaratory judgment action to determine liability for response costs which "will be binding on any subsequent action or actions to recover further response costs or damages," a form of relief plainly encompassed within Juniper's amended complaint. *See In re Chateaugay Corp.*, 944 F.2d at 1008 (noting that, notwithstanding CERCLA's ban on pre-enforcement judicial review, a bankruptcy court may

estimate CERCLA claims pursuant to Bankruptcy Code § 502(c)(1), "with ultimate liquidation of the claims to await the outcome of normal CERCLA enforcement proceedings"). A "contingent" claim predicated on an otherwise valid declaratory judgment entered pursuant to section 9613(g)(2) would be subject to estimation. *See* Bankruptcy Code § 502(c)(1), 11 U.S.C. § 502(c)(1) ("There shall be estimated for purposes of allowance under this section ... any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case....").

itself satisfying the debt due the creditor of the debtor estate, leaving the entity as the sole holder of a claim against the estate based on that debt.[7] *See, e.g., In re Baldwin–United Corp.,* 55 B.R. 885, 895 (Bankr. S.D.Ohio 1985). On the other hand, the section 502(e)(2) "fixing" option presents an especially difficult dilemma for an owner or operator of a targeted facility, such as Juniper, involved in a Superfund contribution action. The onerous CERCLA remediation process may take years to complete, leaving PRPs holding the bag; that is, holding *unallowable* contingent claims for contribution or reimbursement against the chapter 7 estate, claims typically totaling millions of dollars. In such circumstances, section 502(e)(1)(B) may operate to preclude innocent PRPs from recovering CERCLA response costs from a chapter 7 estate even though the estate clearly is responsible for all or part of the environmental contamination. If the EPA opts to refrain from participating in any distribution from the chapter 7 estate, as it may do simply by not filing a proof of claim, Juniper may end up as the only potential EPA enforcement-action target still left standing and solvent.[8] Thus, sometimes the fundamental policy embodied in Bankruptcy Code § 502(e)(1)(B) may promote an expeditious administration of the chapter 7 estate, *see In re American Continental Corp.,* 119 B.R. 216, 217 (Bankr.D.Ariz.1990), at the expense of a fundamental CERCLA policy: the equitable allocation of environmental cleanup costs among all responsible parties.

■ Although section 502(e)(1)(B) may have been devised *primarily* with contract-based codebtor relationships in mind (*e.g.,* guaranties, suretyships), however, its language ("liable with") has been found too plain and inclusive to exempt "joint and several" tort-based obligations from disallowance, *see, e.g., In re American Continental,* 119 B.R. at 217; *In re Pacor, Inc.,* 110 B.R. 686, 688 (E.D.Pa.1990); *In re Wedtech Corp.,* 87 B.R. 279, 284 (Bankr.S.D.N.Y.1988), and the Bankruptcy Code elsewhere carves out no exception for this variety of co-obligation. Moreover, even though CERCLA and SARA postdate the enactment of Bankruptcy Code § 502(e), and plainly envision private rights of action for CERCLA contribution as inducements to spontaneous private cleanup efforts by PRPs, neither environmental statute alludes to the Bankruptcy Code, let alone exempts CERCLA contribution claims from the Code's normal claim procedures. Thus, notwithstanding the purposive liberality with which courts are to construe CERCLA's remedial provisions, *see Kayser–Roth,* 910 F.2d at 26 (" '[W]e will not interpret section 9607(a) in any way that apparently frustrates the statute's goals.' ") (citation omitted), Bankruptcy Code § 502(e)(1)(B) obliges a construction consistent with its plain terms. *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 968, 99 L.Ed.2d 169 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.").

■ Finally, we discern no inherent incompatibility between section 502(e)(1)(B) and the congressional policies underlying CERCLA, such as might enable a court reasonably to conclude that Congress implicitly exempted CERCLA co-obligation claims. Although on occasion section 502(e)(1)(B) may impede CERCLA's *subsidiary* policy of

---

7. Section 502(e)(2) provides:

 A claim for reimbursement or contribution of such an entity that becomes fixed after the commencement of the case shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) of this section, the same as if such claim had become fixed before the date of the filing of the petition.

 11 U.S.C. § 502(e)(2).

8. EPA enforcement actions generally are excepted from the automatic stay provisions. *See* Bankruptcy Code § 362(b)(4), 11 U.S.C. § 362(b)(4); *New York v. Exxon Corp.,* 932 F.2d 1020, 1024–25 (2d Cir.1991). Even were the EPA to reduce to judgment its claim for prepetition damages against the chapter 7 debtors, however, the judgment would not be enforceable against the debtors' estate except through the normal claim allowance process. *See* Bankruptcy Code § 362(b)(5), 11 U.S.C. § 362(b)(5). Moreover, corporate debtors cannot receive a discharge, *see id.* § 727(a)(1), 11 U.S.C. § 727(a)(1) ("The court shall grant the debtor a discharge, unless . . . the debtor is not an individual. . . ."). Consequently, virtually all such chapter 7 proceedings end with the debtor in dissolution and its corporate cupboard bare.

promoting equitable allocations of environmental cleanup costs among responsible parties, pre-"fixing" disallowance does not conflict with CERCLA's *primary* goal—encouraging targeted PRPs to initiate cleanup efforts as expeditiously as practicable in the expectation that their contingent claims may become "fixed" in time for allowance against the debtor estate. *See In re Charter Co.*, 862 F.2d at 1504 (noting obvious environmental benefit from efforts to "fix" contingent claims prior to the closing of the bankruptcy case); *see also supra* note 7.

Accordingly, we conclude that Congress did not exempt CERCLA claims from disallowance under section 502(e)(1)(B).

### 3. Burdens of Proof in Section 502(e)(1)(B) Litigation.

 In the litigation of a section 502(e)(1)(B) objection to a contingent claim, however, the proper allocation of burdens of proof and production may be decisive. A proof of claim which comports with the requirements of Bankruptcy Rule 3001(f) constitutes *prima facie* evidence of the validity and amount of the claim. *See* Fed. R.Bankr.P. 3001(f). The interposition of an objection does not deprive the proof of claim of presumptive validity unless the objection is supported by *substantial evidence. Norton Bankruptcy Law & Practice, Bankruptcy Rules* at 191 (1992); *see also In re Beverages Int'l, Ltd.*, 50 B.R. 273, 276 (D.Mass. 1985). Once the trustee manages the initial burden of producing substantial evidence, however, the ultimate risk of nonpersuasion as to the allowability of the claim resides with the party asserting the claim. *See Bankruptcy Rules*, at 191–92; *see also In re VTN, Inc.*, 69 B.R. 1005, 1006 (Bankr. S.D.Fla.1987). In the present case, therefore, the chapter 7 trustee was required to come forward with substantial evidence that Juniper's claim is one for CERCLA "contribution," which would implicate two related questions: (1) whether Hemingway–Bristol is contingently "liable" to the EPA for future response costs, and (2) whether Juniper is "liable" to the EPA on the same "debt."

### 4. Hemingway–Bristol "Liability" on Joint Obligation.

 At the time it allowed Juniper's claim for *past* response costs, the bankruptcy court determined that Hemingway–Bristol had owned or operated the facility when the passive "disposal" of hazardous substances occurred and that Hemingway–Bristol had actual knowledge of the presence of the leaking barrels. Hence, Hemingway–Bristol is a "covered person," strictly liable to the EPA for future response costs pursuant to 42 U.S.C. § 9607(a)(4)(A).

Juniper nonetheless suggests that the term "liable with" should be interpreted in light of the singular legislative purpose underlying the section 502(e)(1)(B) contingent claim disallowance provision. Like any other claim for contribution, says Juniper, its claim for future CERCLA response costs could pose no "double-dipping" threat were the EPA, for whatever reason, not to participate in any distribution from the chapter 7 estate. Moreover, the EPA has elected not to assert a claim against the estate, despite considerable prodding by Juniper. Rather, the EPA repeatedly has manifested its intention to forego any immediate claim against the chapter 7 estate in favor of administrative enforcement actions against other PRPs, such as Juniper.[9] The trustee responds that the literal language of section 502(e)(1)(B) directs disallowance of the codebtor's [Juniper's] contingent claim even though the creditor [EPA] has not filed a proof of claim by the time the codebtor's claim is considered for allowance.

Section 502(e)(1) directs disallowance of the claim of a codebtor who is *liable with the debtor* on the "claim of a creditor." The pivotal terms—"claim" and "creditor"—are defined. A "claim" is a "*right* to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unse-

---

9. In a May 1987 letter to Juniper, the EPA suggested that it had already exercised its discretion to refrain from asserting an enforcement action against the chapter 7 estate, at least as of that time. Two years later, however, the EPA sent PRP notices to Hemingway and Bristol.

cured." Bankruptcy Code § 101(4), 11 U.S.C. § 101(4) (emphasis added). A "creditor" is an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." *Id.* §§ 101(9), 301 ("The commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter.").

 The EPA presumably holds a prepetition claim against the chapter 7 estate, since its contingent "right to payment" accrued while Bristol and Hemingway owned or operated the facility at which the hazardous waste "disposal" occurred. *Cf. In re Chateaugay,* 944 F.2d at 1002–06 (EPA claim for CERCLA response costs is a prepetition claim if the contamination occurred prior to the petition, without regard to when EPA discovered contamination, or incurred response costs). Although section 502(e)(1)(B) plainly does not require that a creditor's right to payment be evidenced by a timely proof of claim, or a previously allowed claim, *see In re Wedtech Corp.,* 85 B.R. 285, 289 (Bankr.S.D.N.Y.1988), it is nonetheless incumbent on the trustee to produce substantial evidence of the existence of a right to payment on the part of the creditor.

The co-liability clause in section 502(e)(1), *viz.,* "liable with the debtor," interpreted in light of its singular purpose, might permit allowance of a non-fixed codebtor claim for CERCLA contribution if the creditor were *foreclosed* from participating in any distribution from the estate under Bankruptcy Code § 726(a). Nevertheless, though we reject the trustee's contention that the EPA might yet demonstrate "excusable neglect" warranting an extension of time to file a proof of claim,[10] we must examine other means which may remain open to EPA's participation in any chapter 7 distribution.

The EPA may participate in a distribution to unsecured creditors under section 726(a)(2)(C) if it was never scheduled as a "creditor" of the estate, and had no actual knowledge of the proceedings in time to file a proof of claim. *See In re Global Precious Metals, Inc.,* 143 B.R. 204, 205–06 (Bankr. N.D.Ill.1992) (chapter 7).[11] Thus, a remote "double-dipping" prospect would remain if Juniper's claim were to be allowed, as it is conceivable that EPA might yet file an allowable claim.[12]

In this case, however, the harsh results occasioned by Bankruptcy Code § 502(e)(1)(B) are mitigable through recourse to Bankruptcy Code § 501(c), which

10. In a chapter 7 case, proofs of claim must be filed within ninety days after the first date set for the first meeting of creditors. Fed.R.Bankr.P. 3002(c). *See In re Chirillo,* 84 B.R. 120, 122 (Bankr.N.D.Ill.1988). Since the EPA could no longer satisfy any of the six conditions for extension of the ninety-day bar date set forth in Bankruptcy Rule 3002(c), it is precluded from asserting a timely proof of claim against the chapter 7 estate. *See* Fed.R.Bankr.P. 9006(b)(1). Rule 9006(b) plainly precludes resort to Rule 9006(b)(1) to extend a time period prescribed in Rule 3002(c), except "to the extent and under the conditions stated in [Rule 3002(c)]." *Id.* at 9006(b)(3).

11. Bankruptcy Code § 726(a)(2)(C) provides for "payment of any allowed unsecured claim, other than a claim of a kind specified in paragraph (1), (3), or (4) of this subsection, proof of which is ... tardily filed under section 501(a) of this title, if (i) the creditor ·that holds such claim did not have notice or actual knowledge of the case in time for timely filing of a proof of such claim· under section 501(a) of this title; and (ii) proof of such claim is filed in time to permit payment of such claim." 11 U.S.C. § 726(a)(2)(C). The appellate

record does not disclose whether EPA was listed as a creditor. In addition, it is conceivable, though unlikely, that EPA's CERCLA claim might be entitled to share in any subordinate distribution under section 726(a)(3), as an "allowed unsecured claim proof of which is tardily filed," even if EPA was scheduled, or had actual notice of the case prior to the bar date. *See In re Melenyzer,* 140 B.R. 143, 156 n. 42 (Bankr. W.D.Tex.1992) (chapter 7).

12. Of course, the bankruptcy court might condition its allowance of a codebtor's claim on the ultimate failure of the creditor to file a proof of claim. *See* Bankruptcy Code § 502(j), 11 U.S.C. § 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause."). Instead of automatic disallowance, some courts have suggested that the bankruptcy court sharply discount the codebtor's claim to offset this all-or-nothing contingency, or direct that any distribution to the codebtor be placed in trust, to be expended only to reduce the common debt. *See In re Allegheny Int'l., Inc.,* 126 B.R. 919, 924 (W.D.Pa.1991), *aff'd,* 950 F.2d 721 (3d Cir.1991). However, these options find little support in the categorical language of section 502(e)(1)(B).

provides that, "[i]f a creditor does not timely file a proof of such creditor's claim, the debtor or the trustee may file a proof of such claim." *See also* Fed.R.Bankr.P. 3004. Although section 501(c) is permissive ("may file"), rather than mandatory, and is designed principally to prevent creditors from depriving debtors of the benefit of a discharge under Bankruptcy Code § 727, 11 U.S.C. § 727, *cf. supra* note 8, in these circumstances there are sound reasons to require the chapter 7 trustee to shoulder the initial burden of filing a surrogate claim in behalf of the EPA as a precondition to obtaining simultaneous disallowance of Juniper's contingent claim under section 501(e)(1)(B).

■■ First, even if the chapter 7 trustee were to decline to act as an EPA surrogate, Juniper could force the trustee's hand. Under a parallel Code provision, Juniper itself would be permitted to file a surrogate claim for the EPA. *See* Bankruptcy Code § 501(b), 11 U.S.C. § 501(b) ("If a creditor [EPA] does not timely file a proof of such creditor's claim, an entity [Juniper] that is liable to such creditor with the debtor ... may file a proof of such claim.").[13] Were it to resort to the surrogate-claim procedure, Juniper would be required to show simply that "the original debt [due EPA by Heming-

way–Bristol would] be diminished by the amount of the distribution [to the EPA on the surrogate claim]." Fed.R.Bankr.P. 3005(a). Of course, even this modest burden would be obviated if the surrogate claim were to be superseded by the EPA's filing of its own proof of claim. *See id.*[14]

More importantly, mandatory resort to the trustee's option to file a surrogate proof of claim under section 501(c) more readily comports with the allocation of the burden of proof under section 502(e)(1)(B), which would require the trustee to come forward with *substantial* support for the section 502(e)(1)(B) objection to Juniper's proof of claim, and hence, substantial evidence that Hemingway and Bristol were "liable" to the EPA. *See supra* Section II.A.3. In addition, the trustee has title and ready access to the debtors' records, *see* Bankruptcy Code § 521(4), 11 U.S.C. § 521(4) ("[D]ebtor shall ... surrender to trustee all property of the estate, including books, documents, records, and papers...."); *In re Bentley*, 120 B.R. 712, 714 (S.D.N.Y.1990), and the right to require the debtors' officers to submit to examination, *see* Bankruptcy Code § 521(3), 11 U.S.C. § 521(3) ("[D]ebtor shall ... cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties...."); Fed.R.Bankr.P. 4002(4) (Debt-

---

**13.** The equitable considerations underlying the section 501(b) surrogate-claim procedure have been described as follows:

> Section 501(b) and Rule 3005 protect the codebtor against the danger that the creditor, faced with the bankruptcy of the prime debtor, might decide to rely on the solvency of the codebtor and therefore, to abstain from filing a proof of claim. In such a case, while there might be a prospect of securing at least partial satisfaction from the assets of the debtor, the creditor would forego this possibility and merely proceed with his claim against the codebtor. By the time the creditor decided to take such action, any period fixed for the filing of claims might have elapsed. Indeed, the debtor's estate might have been fully administered by the trustee so that the codebtor would be left without the possibility of even partial reimbursement to the extent he has satisfied the claim of the debtor's creditor. The debtor's discharge would remove the possibility that his codebtor could secure indemnification from him at some future time.... [T]he unwillingness of th[e] creditor to take the necessary steps in the administration of bankruptcy

to insure ... participation [in distribution of the debtor's assets] would not deny the ability of the codebtor to do so.

*See* Lawrence D. King, *Collier on Bankruptcy* ¶ 509.02, at 509–6 (15th ed. 1991) [hereinafter *Collier on Bankruptcy*].

**14.** Although the EPA can no longer file a "timely" proof of claim now that the bar date has passed, *see supra* note 10, its forbearance triggers the trustee's and Juniper's rights to file a proof of claim in EPA's behalf. Under Bankruptcy Rules 3004 and 3005(a), the trustee and Juniper normally would have only thirty days from the bar date to file their surrogate claims. But insofar as EPA "did not have notice or actual knowledge of the case in time for timely filing of a proof of ... claim," Bankruptcy Code § 726(a)(2)(C)(i), *see also supra* note 11 and accompanying text, the EPA can yet file a belated claim that can receive payment along with other timely-filed unsecured claims, so long as "proof of such claim is filed in time to permit payment of such claim." *Id.* § 726(a)(2)(C)(ii). Thus, the trustee and Juniper, as EPA surrogates, can avail themselves of the section 726(a)(2)(C) "extended filing" provision.

or must "cooperate with the trustee in ... the examination of proofs of claim...."); *In re Neese*, 137 B.R. 797, 801 (C.D.Cal.1992) (" '[C]ooperate' is a broad term...."). Thus, the trustee is in a far better position than Juniper to ferret out evidence relevant to the EPA's claim against the debtors.

Although disallowance of Juniper's CERCLA claim under section 502(e)(1)(B) is not strictly foreclosed by EPA's failure to file timely proof of its claim, we cannot overlook the fact that the trustee's reliance on section 502(e)(1)(B) may occasion a pointless financial loss to Juniper and result in a windfall to the chapter 7 estate, notwithstanding Juniper's best efforts to induce EPA to file its claim. In this vein, we note that resort to subsections 501(b) and (c) would not compel EPA's participation in the bankruptcy proceedings, *cf. In re Hemingway Transp.*, 70 B.R. 549 (Bankr.D.Mass.1987) (finding sovereign immunity would preclude mandatory *joinder* of EPA as party); *cf. also infra* note 26, but nevertheless would compel a set-aside for EPA's benefit at the time of distribution regardless of its decision to refrain from filing a claim against the chapter 7 estate. The distribution to EPA would result in a reduction in the total indebtedness to EPA for which Juniper and the chapter 7 estate are alleged to be co-liable. In our view, the EPA's recalcitrance, whatever its administrative justification, provides no relevant legal or equitable basis for barring resort to the alternative surrogate-claim filing procedure authorized under subsections 501(b) and (c).

Accordingly, we vacate the bankruptcy court order disallowing Juniper's claim under section 502(e)(1)(B). On remand, the bankruptcy court should prescribe a reasonable bar date by which the chapter 7 trustee must elect whether to file a surrogate EPA claim

pursuant to Bankruptcy Code § 501(c), without prejudice to Juniper's right to submit a surrogate claim under subsection 502(b) as well.[15] Should the trustee not file a timely surrogate claim (and should Juniper not do so), the section 502(e)(1)(B) objection should be dismissed, and the court should estimate Juniper's direct claim against the chapter 7 estate pursuant to normal claim-allowance procedures. *See* Bankruptcy Code § 502(c).

### 5. Juniper's "Liability" on Joint Obligation.

In the event the trustee should file a surrogate claim in behalf of the EPA pursuant to sections 501(c) and 726(a)(2)(C) following remand, we outline the standards governing its consideration by the bankruptcy court.

■■■■ Juniper's "contribution" claim differs in one important respect from codebtor claims normally subjected to disallowance under section 502(e)(1)(B). In the typical contractual relationship between a principal and its surety or guarantor, the codebtor's (surety's or guarantor's) obligation on the common debt arises at the same time as the creditor's (principal's) "right to payment" from the debtor—*during the prepetition period*—which necessarily means that both the creditor and the codebtor hold *prepetition* claims against the debtor estate. Here, on the other hand, regardless whether the EPA has a prepetition or a postpetition claim, Juniper's "right to payment" from Hemingway–Bristol arose, *at the earliest*, when it purchased the facility from the Hemingway–Bristol chapter 11 estate in April 1983. Only then did Juniper become an "owner and operator" of the contaminated facility, hence a "covered person" under CERCLA.[16] Since

---

**15.** Unlike a creditor filing in its own behalf, or a trustee seeking to avail the debtor of the full benefit of a chapter 7 discharge, in this case the chapter 7 trustee may have little incentive to maximize any surrogate claim in behalf of EPA, thus depleting any pro-rata dividend available to other unsecured creditors. A similar problem may arise if any superseding proof of claim filed by EPA were to understate (in Juniper's view) the chapter 7 debtors' share of the CERCLA obligation. We do not construe subsections 501(b) and (c) as suggesting that the trustee could preempt a surrogate EPA claim by Juniper under

section 501(b) asserting that the chapter 7 estate's CERCLA liability to EPA is greater than that asserted in the trustee's section 501(c) surrogate claim. Rather, the bankruptcy court should entertain evidence from the trustee and Juniper, for the purpose of estimating the value of the EPA claim under section 502(c).

**16.** The bankruptcy court implicitly acknowledged as much when it approved Juniper's request for *past* response costs as an administrative expense: "Juniper's cause of action under CERCLA arose when the property containing the

Juniper undeniably holds a *postpetition* "claim," Bankruptcy Code §§ 101(9), 301, 11 U.S.C. §§ 101(9), 301, its "proof of claim" under Bankruptcy Code §§ 501 and 502 is no less readily—and presumably even more accurately—characterized as "a request for payment of an administrative expense" under Bankruptcy Code § 503(a). *See* Bankruptcy Code § 348(d), 11 U.S.C. § 348(d) (providing that claims arising after the filing of a chapter 11 petition and before conversion to chapter 7 shall be treated as prepetition claims, unless they qualify as "administrative expenses" under section 503(b)).[17]

Bankruptcy Code § 503(b)(1)(A) enables an entity to file a request for payment of an administrative expense, including "the actual, necessary costs and expenses of preserving the estate." "As a general rule, a request for priority payment of an administrative expense pursuant to Bankruptcy Code § 503(a) may qualify if (1) the right to payment arose from a postpetition transaction with the debtor estate, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the right to payment was beneficial to the estate of the debtor." *In re Hemingway Transp., Inc.,* 954 F.2d 1, 5 (1st Cir.1991) (citing *In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir.1976)). The trustee argues that administrative expense priority under *Mammoth Mart* is wholly unavailable to Juniper on its claims for past and future response costs, as Juniper's right to contribution from the chapter 7 estate was not supported by consideration (*i.e.,* Juniper's outlay of response costs) which could "benefit" the estate. Thus, the trustee points out that the contaminated facility was no longer property of the chapter 11 estate, hence Juniper's incurrence of response costs would not bring the estate into compliance with federal or state environmental regulations. *Cf. In re Stevens,* 68 B.R. 774, 783 (D.Me.1987) (finding that the State's claim for cleanup expenses incurred in substitute fulfillment of the trustee's legal obligation was entitled to administrative expense priori-

drums was transferred to Juniper or, alternatively, when Juniper expended money in response to the EPA's administrative order." *In re Hemingway Transp.,* 73 B.R. at 503.

17. Courts have long recognized a category of allowable administrative expenses resulting in no discernible benefit to the debtor estate, *see In re Charlesbank Laundry, Inc.,* 755 F.2d 200 (1st Cir.1985), in instances where fundamental fairness required that the claimant's right to distribution take precedence over the rights of general creditors. *See Reading Co. v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). In *Reading,* several business firms, whose premises were damaged by a fire negligently caused by the receiver appointed to operate a Chapter XI business, requested that their fire-loss claims be allowed as administrative expenses of the Chapter XI estate, notwithstanding the fact that the losses sustained as a result of the fire resulted in no "benefit" to the Chapter XI estate. Noting the "decisive, statutory objective [of] fairness to all persons having claims against the insolvent," *Reading,* 391 U.S. at 477, 88 S.Ct. at 1763, the Supreme Court held that the claims for postpetition fire loss were allowable as costs of administration. Its rationale was equitable in nature: unsecured creditors in a Chapter XI reorganization anticipate that their agreement to defer receipt of payment on their prepetition claims may facilitate the reorganization debtor's ultimate rehabilitation, thereby enhancing their prospects for recovery on their prepetition claims. Unlike holders of prepetition claims, however, the firms whose business premises were damaged by the postpetition fire negligently caused by the receiver had "the insolvent business [involuntarily] thrust upon them by operation of law." *Id.* Similarly, in *Charlesbank,* we extended *Reading* to postpetition fines imposed on a chapter 11 estate for deliberate disregard of an injunction. *See Charlesbank,* 755 F.2d at 203.

In citing *Reading* and *Charlesbank* as support for its provisional decision granting Juniper administrative priority for its postpetition contribution claims, the bankruptcy court focused entirely on the *debtors'* failure to disclose the environmental risk prior to the 1983 sale, and the perceived "unfairness" in the "debtor attempting to transfer its liability or potential for liability under state or federal environmental laws" in those circumstances. *See In re Hemingway Transp.,* 73 B.R. at 504. Thus interpreted, *Reading* might permit Juniper to recover the entire cost of its extant "injury"—or the past and future costs of remediation—despite the fact that it has yet to incur some of these response costs. Unlike the injured parties in *Reading* and *Charlesbank,* however, Juniper dealt *voluntarily* on a contractual basis with the chapter 11 estate. No principle of fundamental fairness would entitle Juniper to administrative priority over other unsecured creditors of the Hemingway–Bristol estate if it failed to exercise due diligence in all the circumstances to protect itself, from the outset, against any imposition of CERCLA joint and several liability. In addition, lack of due diligence would, for reasons explained below at pp. 933–34, prevent Juniper from escaping the strictures of section 502(e)(1)(B)'s "fixing" requirement.

ty, where the trustee, who would be prohibited from exercising his power of abandonment in contravention of state environmental protection laws, was still in "possession" of property posing an "imminent and identifiable danger" to public health and safety; contrasting case in which trustee had already been "dispossessed" of waste site at time of government-financed cleanup); *In re T.P. Long Chem., Inc.*, 45 B.R. 278, 284–85 (Bankr.N.D.Ohio 1985). Nor could the CERCLA response costs incurred by Juniper "benefit" the chapter 11 estate while the estate remained jointly and severally liable on the EPA debt. Although we agree that Juniper's incurrence of CERCLA *response costs* might not benefit the estate, on the facts of this case we cannot agree that *Mammoth Mart* priority is altogether unavailable to Juniper.

In the context of their arm's-length purchase-sale transaction in 1983, we must presume that Juniper and the chapter 11 estate were cognizant of the federal and state environmental laws then in effect, and that, notwithstanding Juniper's resulting status as an "owner or operator" of the contaminated facility, the chapter 11 estate could remain liable for any response costs later incurred by Juniper and for which the debtors (or the debtor estate) were liable under CERCLA section 9607(a), an obligation explicitly provided for presently in 42 U.S.C. §§ 9607(a)(4)(B) and 9613(f). *See O'Neil*, 883 F.2d at 179 (noting that SARA contribution provisions merely "codif[ied] [a remedy] that most courts had concluded was implicit in the 1980 Act"); *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1457 n. 3 (9th Cir.1986) (collecting pre-SARA caselaw recognizing implicit right of contribution in CERCLA). There is no record evidence that the estate either contracted away its obligation to contribute, or bargained for a right to indemnification from Juniper. *See* 42 U.S.C. § 9607(e) (purported transfers of CERCLA liability cannot exonerate transferor, but indemnification agreements are permissible). Similarly, to the extent that the $1.6 million purchase price for the facility presumptively reflected the parties' allocation of the risks relating to these contribution costs, the $1.6 million constituted "consideration" supporting Juniper's right to payment for contribution for response costs from the estate. Obviously, this substantial infusion of cash benefitted the chapter 11 rehabilitation effort. Thus, the $1.6 million in purchase monies constituted the requisite baseline "consideration" for Juniper's right to contribution; and response costs subsequently incurred by Juniper a mere maturation of that right, immaterial for *Mammoth Mart* purposes.

 On the other hand, we agree that *Mammoth Mart* priority is unavailing to Juniper insofar as its right to contribution for future response costs remains "contingent" at the time the bankruptcy court considers Juniper's claim for allowance against the debtor estate. Only "actual" administrative expenses, not contingent expenses, are entitled to priority payment under Bankruptcy Code § 503(b)(1)(A). Even though Juniper's postpetition contribution claim, *once allowed*, would be entitled to priority treatment under section 503(b), the parallel restrictions in section 502(e)(1)(B) pose an additional hurdle. Under its clear terms, section 502(e)(1)(B) does not apply exclusively to "creditors," or in other words, to holders of *prepetition* claims for reimbursement or contribution. Section 502(e)(1)(B) refers to the holder of the claim as an "entity," not as a "creditor" of the estate.[18] Accordingly, Juniper's priority "claim for reimbursement or contribution" would be allowable if *either*: (1) Juniper and the chapter 11 estate are not strictly, jointly, and severally liable ("liable with the debtor") on the EPA debt under the liability provisions of the CERCLA statute, *or* (2) Juniper's response costs have become "fixed" and "actual" (*i.e.*, have been expended by Juniper for remediation or paid over to the EPA) by the time Juniper's claim is considered for disallowance. As Juniper's contingent claim for future response costs is, by definition, not "fixed," Juniper cannot escape the consequences of section 502(e)(1)(B) unless it is not strictly and jointly "liable" with Hemingway–Bristol on the EPA debt. *Cf. infra*

---

18. "Creditor" means an "entity that has a claim that arose at the time of or before the order of relief." Bankruptcy Code § 101(9), 11 U.S.C. § 101(9).

Section II.C. (*Mammoth Mart* administrative expense priority would attach to Juniper's "fixed" claim for *past* response costs). We turn, therefore, to the question of Juniper's alleged liability to the EPA.

The threshold question is whether Juniper is even asserting a *direct* CERCLA claim against the chapter 7 estate, or merely a *derivative* claim for "contribution" from the chapter 7 estate. CERCLA section 9613(f) is the sole statutory basis for a right to "contribution," *see supra* note 5 and accompanying text, but CERCLA prescribes other remedial provisions as well. Unlike section 9613(f), a private right of action for CERCLA response costs under section 9607(a)(4)(B) is available to "*any person*" who incurs necessary response costs, presumably without regard to whether the plaintiff is an EPA target, *i.e.*, a PRP or "covered person" under section 9607(a). *See* 42 U.S.C. § 9601(21) ("person" includes "corporation"). Section 9607(a)(4)(B) simply requires the private-action plaintiff to prove that (1) a release of a "hazardous substance" from the subject "facility" occurred or is threatened; (2) the defendant comes within any of four categories of "covered persons," which include current owners or operators of the facility, *see* 42 U.S.C. § 9601(9)(B), as well as the owners and operators of the facility at the time the contamination occurred; (3) the release or threatened release has caused (or may cause) the claimant to incur response costs;[19] and (4) the response costs are "necessary" and "consistent with the national contingency plan." *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1150 (1st Cir.1989).[20]

For instance, a *neighboring* landowner, who is neither a current nor a past owner or operator of the contaminated facility, hence not strictly liable as a "covered person" under section 9607(a), may incur response costs as a result of a threatened release and potential migration of hazardous substances from an adjoining property, and may assert a right of action under section 9607(a)(4)(B). *See, e.g., Dedham Water*, 889 F.2d at 1146–48 (noting that water utility would have cause of action under section 9607(a)(4)(B) against neighboring property owner for response costs relating to threatened release). On the other hand, in the event the private-action plaintiff itself is potentially "liable" to the EPA for response costs, and thus is akin to a joint "tortfeasor," section 9607(a)(4)(B) serves as the *pre-enforcement* analog to the "impleader" contribution action permitted under section 9613(f). *See* 42 U.S.C. § 9613(f) ("Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section [9606] or section [9607].")*; see also Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 890–91 (9th Cir. 1986) (holding that section 9607(a)(4)(B) grants private right of action for response costs, without regard to any prior EPA enforcement actions).

Because Juniper's initial complaint in the instant adversary proceeding invoked generic claims for "contribution" and "indemnification," without attribution to any statutory source, the bankruptcy court specifically requested Juniper "to amend Count I [of its complaint] to include the statutory prerequisite [sic] of 42 U.S.C. § 9607(a)(4)(B)." Although the amended complaint represents at best an imperceptible improvement over its predecessor, the bankruptcy court apparently considered it adequate to assert such a

---

**19.** "Response costs," 42 U.S.C. § 9601(25), include costs incurred in "removal" actions, which address immediate threats to public health and safety caused by hazardous substances, 42 U.S.C. § 9601(23), and costs incurred in "remedial" actions, directed at long-term or permanent remediation of the contamination, 42 U.S.C. § 9601(24).

**20.** Section 9607(a) provides, in pertinent part:

(1) [T]he owner and operator of a vessel or a facility,

(2) [A]ny person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of ... shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State ...

(B) any other *necessary costs of response* incurred by *any other person* consistent with the national contingency plan.

42 U.S.C. § 9607(a)(2)(B) (emphasis added).

claim.[21] Juniper's amended complaint bears this out. It alleges that (1) Juniper is a current owner of the facility, but not that it is a "covered person" under section 9607(a); (2) Hemingway and Bristol fraudulently concealed the presence of hazardous wastes at the facility prior to the 1983 sale; and (3) Juniper neither knew nor had "reason to know" of the contamination until 1985.

■ The bankruptcy court concluded that Juniper, as the current "owner" of the facility, undoubtedly would be "liable" to the EPA in an enforcement action simply by virtue of its *prima facie* status as a "covered person" under section 9607(a).[22] The undefined term "liable" is common to both CERCLA § 9607(a) and Bankruptcy Code § 502(e)(1)(B). Its construction presents a question of law subject to plenary review. *See In re Erin Food Servs., Inc.*, 980 F.2d 792, 794 (1st Cir.1992) (citing *In re LaRoche*, 969 F.2d 1299, 1301 (1st Cir.1992)).

■ Of course, not all "covered persons" are strictly liable for response costs. The harsh effects of the strict liability rule are subject to mitigation through resort to certain affirmative defenses. Section 9607(b) expressly provides that "[t]here shall be *no liability* under section [9607](a) ... for a person otherwise liable who can establish by a preponderance of the evidence [the following defenses]...." *See also Environmental Transp. Sys. v. ENSCO, Inc.*, 969 F.2d 503, 504 n. 3 (7th Cir.1992). Section 9607(b)(3) would afford a complete defense to CERCLA liability if Juniper were to establish that (1) it

acquired the facility after the initial deposit of the hazardous substances; (2) at the time of its acquisition, it did not know and had "*no reason to know*" that any hazardous substance was deposited at the facility; and (3) once the presence of the hazardous substance became known, Juniper exercised due care in the circumstances. The statute defines the term "no reason to know" as follows:

[T]he [buyer] must have undertaken, at the time of acquisition, *all appropriate inquiry* into the previous ownership and uses of the property consistent with good commercial or customary practice *in an effort to minimize liability*. For purposes of the preceding sentence the court shall take into account any specialized knowledge or experience on the part of the [buyer], *the relationship of the purchase price to the value of the property if uncontaminated,* commonly known or reasonably ascertainable information about the property, *the obviousness of the presence or likely presence of contamination* at the property, and the ability to detect such contamination by appropriate inspection.

42 U.S.C. § 9601(35)(B) (emphasis added); *see also United States v. Pacific Hide & Fur Depot, Inc.*, 716 F.Supp. 1341, 1347 (D.Idaho 1989); *cf.* 42 U.S.C. § 9622(g) (*de minimis* settlement provisions not applicable to owners who purchased land with actual or constructive knowledge of contamination). As an acquiring party and an owner of the facility during a period of "passive" disposal,[23]

**21.** The bankruptcy court opinion states: "In the context of this case, it is possible to view Juniper as a direct creditor of Hemingway and as an entity jointly liable with the Debtor." *In re Hemingway Transp.*, 105 B.R. at 175.

**22.** The bankruptcy court based its section 502(e)(1)(B) disallowance on the ground that Juniper had denominated its claim a derivative claim for "contribution," thereby conceding its co-liability with the Hemingway–Bristol estate for future response costs. In our view, this ruling exalts form over substance, and ignores both the liberality with which pleadings must be construed and the right to plead alternative or seemingly "inconsistent" claims. *See* Fed.R.Bankr.P. 7008(a) (incorporating Fed.R.Civ.P. 8(e), providing that "[a] party may set forth two or more statements of a claim or defense *alternatively* or hypothetically ... *regardless of consistency*....")

(emphasis added); *cf. also Schott Motorcycle Supply, Inc. v. American Honda Motor Co.*, 976 F.2d 58, 61–62 (1st Cir.1992). Given the comparative breadth of the section 9607(a)(4)(B) remedy, and Juniper's explicit allegation that it had no actual or constructive knowledge of the contamination at the time it purchased the facility, we think the trustee must come forward with substantial evidence from which the bankruptcy court could conclude that Juniper is a "covered person" liable to the EPA for future response costs.

**23.** The parties do not challenge the bankruptcy court ruling that the Hemingway–Bristol estate is "liable" for the "passive" disposal at the facility (*i.e.*, the leaking of previously generated or deposited containers of hazardous waste), even absent evidence that the chapter 7 estate contributed to the generation or the deposit of the hazard-

Juniper would be held to an especially stringent level of preacquisition inquiry—on the theory that an acquiring party's failure to make adequate inquiry may itself contribute to a prolongation of the contamination.[24]

Thus, under *either* section 501(e)(1)(B) *or* section 503(a), Juniper's participation in any distribution from the chapter 7 estate hinges entirely on the validity of its "innocent landowner" defense. Notwithstanding its relevance, the "innocent landowner" defense was never explicitly considered by the bankruptcy court in connection with the trustee's motion for summary judgment disallowing Juniper's CERCLA claim pursuant to section 502(e)(1)(B), nor in connection with its earlier provisional ruling on Juniper's entitlement to administrative priority. *Cf. supra* note 17. The record contains mixed signals on the "innocent landowner" defense. In a May 19, 1987 letter to Juniper, the EPA opined that Juniper would not be entitled to the "innocent landowner" defense, for several reasons: Juniper (1) knew in 1983 that the facility was in close proximity (200 feet) to a larger Superfund site already included on the national priority list; (2) made no preacquisition inquiry of EPA or DEQE concerning possible contamination in the area; and (3) did not obtain available maps showing an unpaved access road to the allegedly inaccessible portion of the facility where the drums were found.

The EPA opinion is not necessarily dispositive as to the allowability of a claim or an administrative expense request. Nevertheless, after trial on the issue of Hemingway's liability for past response costs, the bankruptcy court noted (notwithstanding Juniper's contention that the drums were located in an area which was inaccessible at the time of the 1983 sale) that "*easy access* to the location of the barrels is possible along the City of Woburn's sewer easement, which par-

allels the MBTA tracks." *In re Hemingway Transp.*, 108 B.R. at 380 (emphasis added). The record further suggests that Juniper, an experienced land developer in the Woburn area, may have been familiar with the environmental risks posed by its acquisition of the facility, and therefore may have been cognizant that the $1.6 million purchase price reflected a discount due to contamination. *Cf. Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 90 (3d Cir.1988) (in allocating responsibility between vendor and purchaser, court may consider any implicit discount in sale price as reflecting assumption of risk of contamination).

On the other hand, the record indicates that the bankruptcy court may have considered Juniper's responsibility for any contamination extremely minimal, especially in comparison to Hemingway–Bristol. For example, in allowing Juniper's contribution claims for *past* response costs, the bankruptcy court allocated *total* financial responsibility to Hemingway–Bristol, *see supra* note 4, despite the fact that the court also found no evidence that Hemingway–Bristol, throughout twenty years' occupancy, ever generated or deposited hazardous wastes at the facility. The bankruptcy court further found that Juniper was never "apprised of the presence of hazardous wastes...." *In re Hemingway Transp.*, 73 B.R. at 501. And, of course, discount prices are not uncommon in forced sales of the assets of insolvent estates.

 Since the bankruptcy court's disallowance of Juniper's claim must be vacated on independent grounds, *see supra* Section II.A.4, on remand the trustee will have the burden to file a surrogate claim in behalf of the EPA *and* the burden to come forward with substantial evidence that Juniper is not entitled to an "innocent landowner" defense. The ultimate burden of proof on that defense, however, will remain with Juniper. The

---

ous substances in the first instance. Furthermore, the chapter 7 estate could not establish an "innocent owner" defense: the 1982 DEQE notice afforded the debtors *actual* knowledge that drums of contaminants were located at the facility. On the other hand, the bankruptcy court found that "none of the interested parties, including the Trustee, Juniper and the two courts that approved the sale, were apprised of the presence of hazardous wastes on the property,

despite the DEQE action." *In re Hemingway Transp.*, 73 B.R. at 501–02.

**24.** The EPA informed Juniper in May 1987 that its alleged contribution to the passive disposal was undetermined because the extent of the post–1983 "contaminant plume" at the facility had yet to be ascertained.

bankruptcy court should determine whether Juniper made "all appropriate" preacquisition inquiry pursuant to 42 U.S.C. § 9601(35), a factual finding which would be subject to clear error review only. Should the bankruptcy court find that Juniper did not have notice or actual knowledge of the contamination at the time it purchased the facility in 1983, Juniper's claim for past and future response costs should be estimated[25] and allowed as administrative expenses entitled to priority.[26] On the other hand, if Juniper did not take all appropriate steps to protect itself from CERCLA liability, its lack of diligence exposed it to the harsh consequences of strict, joint and several liability under CERCLA. In that event, Juniper's claim would be subject to the section 502(e)(2) "fixing" requirement and Juniper would not be entitled to administrative expense priority with respect to any allowable CERCLA claim.

### B. *Juniper's Appeal: Disallowance of Attorney Fees (42 U.S.C. § 9607(a)).*

 Juniper argues for an award of attorney fees pursuant to 42 U.S.C. § 9607(a)(4)(B), which makes no reference to "attorney fees" in private cost recovery actions. Juniper contends that the term "necessary costs of response" should be broadly construed to encompass attorney fee awards so as to advance CERCLA's remedial purposes by inducing PRPs to cooperate in initiating prompt cleanup efforts. We affirm on the grounds advanced in the well-reasoned district court opinion. *See In re Hemingway Transp., Inc.,* 108 B.R. at 383.

 Absent an explicit statutory authorization, a party is not entitled to recover attorney fees simply because it prevailed in the litigation. *Runyon v. McCrary,* 427 U.S. 160, 185, 96 S.Ct. 2586, 2601–02, 49 L.Ed.2d 415 (1976). CERCLA contains explicit provisions authorizing attorney fee awards in certain other types of actions. *See, e.g.,* 42 U.S.C. § 9610(c) (employee-whistleblowers may recover "all costs and expenses (including attorney's fees)...."); *id.* § 9659(f) (prevailing parties in private citizen suits may recover costs of litigation, "including reasonable attorney and expert witness fees"). Moreover, Congress did not consider, and SARA did not include, any attorney fee award amendment applicable to the private cost recovery provision in section 9607(a)(4)(B). We therefore conclude that Congress has elected not to authorize attorney fee awards in these actions. *Cf. Dedham Water Co., Inc. v. Cumberland Farms Dairy, Inc.,* 972 F.2d 453, 461 (1st Cir.1992) ("[L]itigation-related expenses are, of course, not

---

**25.** Because of its earlier section 502(e) disallowance, the bankruptcy court refused to permit Juniper to introduce evidence of anticipated future cleanup costs. Although we need not decide the issue at this juncture, we note that the EPA's nonbinding preliminary allocation of responsibility may be inadmissible evidence as to the value of Juniper's claim for future response costs, *see* 42 U.S.C. § 9622(e)(3)(C) ("The nonbinding preliminary allocation of responsibility shall not be admissible as evidence in any proceeding ... [nor] constitute an apportionment or other statement on the divisibility of harm or causation."), and, on remand, that it may be incumbent on Juniper to present other evidence of the extent of its "injury."

**26.** The determination of Juniper's CERCLA "liability" by the bankruptcy court is required solely for purposes of the allowance or disallowance of Juniper's proof of claim, a core proceeding in bankruptcy, and the court cannot ignore the possibility that the EPA might yet maintain a successful enforcement action against Juniper. But unlike the holder of a *prepetition* claim for contribution, which normally must await final distribution under Bankruptcy Code § 726, Juniper would enjoy a distinct distributional advantage should it succeed in establishing its entitlement to the "innocent landowner" defense under section 9607(b)(3). The court properly could provide for the *immediate,* pre-distribution payment of Juniper's "claim" *in trust, see, e.g., In re Allegheny Int'l, Inc.,* 126 B.R. at 924 ("Creation of a trust to be expended on contingent claims is a frequently used mechanism for insuring that such funds are properly disbursed.") (citing *In re Johns–Manville Corp.,* 68 B.R. 618, 625–26 (Bankr.S.D.N.Y.1986, *aff'd,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd,* 843 F.2d 636 (2d Cir. 1988)), exclusively for "necessary" future response costs at the facility. *See* 3 *Collier on Bankruptcy* ¶ 503.01, at 503–5 (citing *In re Verco Indus., Inc.,* 20 B.R. 664, 665 (Bankr.9th Cir. 1982) (holding that bankruptcy court has discretion to order early payment of an administrative expense)); *cf. supra* note 12. In this manner, the EPA debt would be reduced *pro tanto* by any disbursement from the trust account, thereby effecting a *de facto* "fixing" of the EPA debt should EPA later attempt to file a claim against the chapter 7 estate. *See supra* note 7.

compensable as response costs incurred by private parties under CERCLA § [9607].") (citing *Regan v. Cherry Corp.*, 706 F.Supp. 145, 149 (D.R.I.1989)). Although a strong case might be made that attorney fee awards in private cost recovery actions promote CERCLA's remedial aims, *see, e.g., General Elec. Co. v. Litton Indus. Automation Sys., Inc.*, 920 F.2d 1415 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991), that case is one for the legislative venue. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 263–64, 95 S.Ct. 1612, 1625, 44 L.Ed.2d 141 (1975) ("[I]t would be difficult, indeed, for the court, without legislative guidance, to consider some statutes important and others unimportant and to allow attorneys' fees only in connection with the former."); *see also U.S. Steel Supply Inc. v. Chatwins Group, Inc.*, No. 89–C20241, 1992 WL 229252, at 16–17, 1992 U.S.App. LEXIS 13722, at 45–46 (N.D.Ill. Sept. 9, 1992).

■ Juniper argues, nonetheless, that only a small portion of its attorney fees were incurred in preparation for the "response cost" recovery litigation itself, the greater portion having been incurred to ensure that Juniper's "response" was in compliance with the administrative order issued by the EPA. We conclude that the present claim was waived. At trial, Juniper's attorney fee billings were admitted in evidence. Juniper suggested no distinction between attorney fees incurred for litigative and administrative purposes.[27] Juniper's failure to advance the present contention below deprived the bankruptcy court of an opportunity to consider it, thereby waiving the claim. *See In re LaRoche*, 969 F.2d 1299, 1305 (1st Cir.1992) (arguments not raised in bankruptcy court cannot be raised for first time on appeal); *In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1343 (1st Cir.1992) (same).[28]

## C. The Trustee's Cross–Appeal: Administrative Expense Priority for Past Response Costs.

■ The trustee appeals the allowance of Juniper's claim for past response costs as an administrative expense entitled to priority distribution. The bankruptcy court ruled that Juniper's CERCLA liability resulted from its postpetition purchase of the facility from Hemingway–Bristol, debtor in possession, during the course of the chapter 11 proceeding. The bankruptcy court found that it would be fundamentally "unfair" not to allow Juniper to receive payment of its contribution claim in advance of other creditors. *See supra* note 17 (noting court's reliance on *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968)).

We affirm the allowance of Juniper's claim for past response costs as an administrative expense entitled to priority distribution under Bankruptcy Code §§ 503(b)(1)(A), 507(a)(1) and 726(a)(1). *See Norris v. Lumbermen's Mut. Cas. Co.*, 881 F.2d 1144, 1151–52 (1st Cir.1989) (appellate court may affirm on any ground supported by the record). As concerns Juniper's claim for CERCLA response costs previously incurred, its entitlement to priority does not hinge on the court's determination of the merits of Juniper's "innocent landowner" defense. Even if Juniper and the Hemingway–Bristol estate are co-"liable" on the EPA debt, Juniper's claim for past response costs escapes the section 502(e)(1)(B) co-liability problem encountered by its claim for future response costs, because Juniper's right to payment for past response costs became "fixed" upon Juniper's

---

27. Prior to admitting Juniper's attorney fee billing in evidence, the bankruptcy judge stated: "[A]ssuming only for the moment that legal services are a compensable item of damage [under CERCLA], then aren't all reasonable fees incurred by the plaintiff resulting from the alleged harm, aren't they all compensable? ... [D]idn't [Juniper's attorneys] perform services as a result of the acts of the defendant if I find the defendant liable?" Thus, the court plainly signaled its intention to treat Juniper's entire attorney fee request as either compensable or noncompensable.

28. Even assuming the issue was preserved, the record on appeal does not enable reliable appellate review. It is impossible to determine with reasonable confidence whether the attorney fees incurred by Juniper were reasonably "necessary" to facilitate its compliance with the EPA administrative order, or to discover the existence or whereabouts of other PRPs who might be amenable to suit by Juniper in an action for contribution.

incurrence of actual and necessary response costs prior to the time its claim was considered for allowance. On the other hand, if Juniper and the estate are not co-"liable" on the EPA debt, because Juniper has the benefit of the "innocent landowner" defense, both its past and future response costs are recoverable as priority administrative expenses under either *Mammoth Mart* or *Reading.*

## III

### CONCLUSION

We vacate the bankruptcy court's section 502(e)(1)(B) disallowance of Juniper's claim for future response costs. On remand, the bankruptcy court shall permit the chapter 7 trustee and Juniper a reasonable time within which to file surrogate claims in behalf of the EPA under sections 501(b) or 501(c) of the Bankruptcy Code. Should the trustee file a timely surrogate claim, and should Juniper choose to press for simultaneous allowance of its so-called "direct" claim, the court should determine whether Juniper would be entitled to an "innocent landowner" defense pursuant to 42 U.S.C. § 9601(35)(B). If Juniper is so entitled, its claim for "contribution" should be allowed as an administrative expense. If not so entitled, its claim should be disallowed unless and until Juniper "fixes" its right to contribution by actually incurring any such response costs by the time its claim is considered for allowance. If the chapter 7 trustee elects not to file a surrogate claim under section 501(b), thereby waiving the section 502(e)(1)(B) objection to Juniper's direct claim against the chapter 7 estate, the court should receive evidence relating to the extent of Juniper's anticipated response costs and should allow Juniper's claim as an administrative expense of the chapter 11 estate.

**The order disallowing an award of attorney fees, and the order allowing Juniper's claim for past response costs as an administrative expense, are affirmed. The order disallowing Juniper's claim for future response costs is vacated and remanded to the bankruptcy court for further proceedings consistent with the opinion herein; costs to neither party.**